IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BETSY WOLF, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| TEMPLE UNIVERSITY, | : | NO. 2:21-cv-00866 |
| | : | |
| Defendant. | : | |

**ORDER**

And now, this ___ day of _____, 2021, upon consideration of the motion of Temple University for summary judgment, and the plaintiff's response thereto, it is hereby ORDERED that the motion is GRANTED.

Judgment is granted in favor of Temple University.


BY THE COURT:


_____
WENDY BEETLESTONE, J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BETSY WOLF, | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| TEMPLE UNIVERSITY, | : | NO. 2:21-cv-00866 |
| Defendant. | : | |

**TEMPLE UNIVERSITY'S MOTION FOR SUMMARY JUDGMENT**

For the reasons set forth below and in the accompanying memorandum of law, Temple University, whose proper corporate name is Temple University–Of The Commonwealth System of Higher Education (Temple), moves for summary judgment on all of Plaintiff Betsy Wolf's claims.[1]

Plaintiff, whom Temple laid off for budgetary reasons in June 2018 from her position as a Senior Administrator within the Temple University Physicians (TUP),[2] claims that her layoff and Temple's failure to rehire her resulted from one or both of the following unlawful reasons: (a) retaliation for her complaints about what she perceived as Temple's failure to sufficiently address an incident of anti-Semitism in which someone scrawled a swastika on the wall outside her office in November 2017 (the "swastika incident"); or (b) age discrimination.

---

[1]     Plaintiff's complaint alleges claims of discrimination and retaliation under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000 (Count I); the Age Discrimination in Employment Act, as amended, 29 U.S.C. § 623 et seq. (ADEA) (Count II); the Pennsylvania Human Relations Act, as amended, 43 P.S. §951, et seq. ("PHRA") (Count III); and the Philadelphia Fair Practices Ordinance, as amended, Phila. Code § 9-1100, et seq. (Count IV).

[2]     During Plaintiff's employment at Temple and at the time of her layoff, she worked for Temple University Physicians (TUP), the entity within Temple University's Lewis Katz School of Medicine through which the Medical School's physician faculty members practiced medicine. On July 1, 2019, Temple Faculty Physicians (TFP), a new practice plan entity, was established under the Temple University Health System (TUHS). On January 1, 2021, the non-faculty staff of TUP transitioned from Temple University to TFP/TUHS.

At the end of discovery, in which Plaintiff deposed seven current and former high-level physicians and administrators from Temple's School of Medicine, and in which Temple supplied more than 4,200 pages of documents in response to Plaintiff's requests, Temple moves for summary judgment because there is no evidence whatsoever that Plaintiff's layoff or non-rehire resulted from unlawful discrimination or retaliation, whether related to the swastika incident or to Plaintiff's age.

To the contrary, the evidence garnered from all sources supports the simple and straightforward explanation that Temple provided to Plaintiff at the time of her layoff and since, namely that budgetary reasons led to the decision to lay her off in 2018. The evidence further establishes that Temple did not interview or hire any external candidates for the job postings for which Plaintiff applied after her layoff, and that it withdrew each of those job postings for reasons that had nothing to do with Plaintiff.

For all these reasons, and those set forth in the accompanying statement of undisputed facts and memorandum of law, no reasonable jury could find in Plaintiff's favor on her claims of discrimination or retaliation under any of the statutes cited in the complaint, and therefore the Court should grant Temple's motion for summary judgment on all counts.

RESPECTFULLY SUBMITTED,


Dated:  November 19, 2021          /s/ Michael E. Sacks
                                   NEIL J. HAMBURG
                                   MICHAEL E. SACKS
                                   ID. NO. 32175, 39774
                                   HAMBURG LAW GROUP, PLLC
                                   1 Franklin Town Blvd, Suite 1106
                                   Philadelphia, PA  19103
                                   (215) 432-1411

                                   Attorneys for Defendant
                                   Temple University

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BETSY WOLF, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| TEMPLE UNIVERSITY, | : | NO. 2:21-cv-00866 |
| | : | |
| Defendant. | : | |

**TEMPLE UNIVERSITY'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

NEIL J. HAMBURG
MICHAEL E. SACKS
ID. NO. 32175, 39774
HAMBURG LAW GROUP, PLLC
1 Franklin Town Blvd, Suite 1106
Philadelphia, PA  19103
(215) 432-1411

Attorneys for Defendant
Temple University

# TABLE OF CONTENTS

PAGE

I.   Introduction   1

II.  There is no evidence to support Plaintiff's claims of discrimination or retaliation.   4

    A.   Overview of Plaintiff's work history   4

    B.   TUP faced chronic budget shortfalls, and took steps each year to increase efficiencies and cut costs   5

    C.   The reasons provided to Plaintiff for her layoff were real, and not a pretext for age discrimination.   10

    D.   Temple did not discriminate or retaliate against Plaintiff because of her complaints about Temple's response to the 2017 "swastika incident."   13

    E.   Mr. Kupp's questions about Plaintiff's future plans, or retirement plans, do not support an inference of age discrimination   15

    F.   The evidence is undisputed that Temple withdrew each of the job postings to which Plaintiff applied in Fall 2018 and Fall 2019 for reasons unrelated to Plaintiff   17

III. Argument   18

    A.   The Summary Judgment Standard   18

    B.   The Court should grant summary judgment on Plaintiff's retaliation claim because there is no evidence in the record from which a reasonable jury could find a causal connection between her complaints about Temple's response to the swastika incident and her layoff approximately five months later   22

    C.   The Court should grant summary judgment on Plaintiff's age discrimination claim because Plaintiff cannot point to evidence that would lead a jury to disbelieve Temple's stated reasons for Plaintiff's layoff, or find that discrimination was more likely than not a determinative cause of the layoff   24

D.      There is no evidence that Temple did not re-hire Plaintiff for          28
        discriminatory reasons

IV.    Conclusion                                                               28

# TABLE OF AUTHORITIES

PAGE

*Fichter v. AMG Resources Corp.*, 528 Fed. Appx. 225 (3d Cir. 2013)          25

*Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561 (3d Cir. 2002)          3

*Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)          24

*Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403 (3d Cir. 1999)          3

*Kautz v. Met-Pro Corp.*, 412 F.3d 463 (3d Cir. 2005)          25

*Ngai v. Urban Outfitters*, 2021 WL 1175155 (E.D.Pa. 2021)          3, 18, 19, 20, 21, 22

**TEMPLE UNIVERSITY'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Temple University[1] (Temple), submits this memorandum of law in support of its Motion for Summary Judgment.

## I.    Introduction

In June 2018, Temple laid off Plaintiff Betsy Wolf from her position as a Senior Administrator in Temple's School of Medicine for budgetary reasons. In the fall of 2018 and again in 2019, Plaintiff applied for posted positions at Temple similar to the position she had before her layoff, but Temple withdrew the postings for reasons unrelated to Plaintiff and neither interviewed nor hired *anyone* for those positions.

In her lawsuit, Plaintiff claims that Temple's stated reasons for her layoff and non-rehire were pretextual, and that Temple actually laid her off and failed to rehire her because of discrimination or retaliation related to her complaints about Temple's response to a 2017 anti-Semitic incident, or because of age discrimination, or both.  There is not a scintilla of evidence supporting Plaintiff's claims of discrimination or retaliation, or to cast doubt on Temple's articulated reasons for Plaintiff's layoff.

Plaintiff worked for the faculty practice plan at Temple University's School of Medicine (SOM), the entity through which the physician faculty members of the SOM treat patients and bill for services. The practice plan, called Temple University Physicians (TUP), was[2] a 300 million a

---

[1]    Temple University's proper corporate name is Temple University-Of the Commonwealth System of Higher Education.

[2]    On July 1, 2019, Temple Faculty Physicians (TFP), a new practice plan entity, was established under the Temple University Health System (TUHS). On January 1, 2021, the non-faculty staff of TUP *transitioned from Temple University to TFP/TUHS.* (Jt. Appx. 769, Fino depo. p. 34-35)

year enterprise that faced chronic financial and budget issues in large part due to the combination of its patient population and stagnant Medicaid reimbursement rates.

Thomas Kupp, the Senior Vice Dean for Finance and Administration and Executive Director of the TUP at the SOM, along with Lisa Fino, the TUP's Chief Operating Officer and Greg Zimmaro, the Assistant Dean for Human Resources, acted as the TUP's senior administrative leadership group. Mr. Kupp, Ms. Fino and Mr. Zimmaro, all in their 60's and all of whom have worked at Temple for many years,[3] met together weekly to keep the TUP on course and on budget, finding ways to centralize administrative functions, create shared services, outsource and, sadly, lay off staff as a last resort.

Plaintiff aggressively pursued discovery through interrogatories, four separate sets of document requests that resulted in Temple producing more than 4,200 pages of documents, and depositions of seven current and former high-ranking employees of Temple's School of Medicine. With regard to Plaintiff's claim of retaliation for complaining to the Dean of the School of Medicine and to Temple's President about what she believed was Temple's inadequate response to someone scrawling a swastika on the wall outside her office in 2017, there  is no evidence that anyone – the Dean, the President, or any of the individuals involved in the decision to lay her off approximately five months after her complaints – were upset, angry, frustrated or otherwise unhappy about Plaintiff's complaints.

With regard to Plaintiff's claim of age discrimination, it is uncontroverted that the TUP faced chronic annual budget shortfalls, that TUP leadership made cutbacks and imposed staff layoffs each year, and that Plaintiff herself participated in such layoffs in her role as a Senior

---

[3]      Mr. Kupp, Ms. Fino and Mr. Zimmaro each gave their date of birth and their start dates at Temple in their depositions. They have worked at Temple for 18, 12 and 26 years respectively. (Jt. Appx. 462, 516, Zimmaro depo. p. 7, 222; Jt. Appx. 84, Kupp depo. p. 7-8; Jt. Appx. 762, Fino depo. p. 7)

Administrator. No evidence contradicts Temple's position that Plaintiff's layoff was part of that cost-cutting process to meet the budget. All decisionmakers testified that Plaintiff's age never came up in ***any*** discussions preceding her layoff, nor was it a factor at all.

Plaintiff tried mightily in discovery to develop circumstantial evidence of age discrimination by pursuing the assertion in her Complaint that Mr. Kupp asked her about her retirement plans less than a year before her layoff. What emerged, however, was that Mr. Kupp talked to all of the individuals at Plaintiff's level about their future plans for purposes of succession planning, simply as a matter of good business practice. (Jt. Appx. 111, Kupp depo., p. 113p) Several of Plaintiff's cohort of departmental administrators – which included at least seven other people in their sixties like Plaintiff – in fact discussed their plans to retire within the following several years. As it turned out, some of those highly valued individuals stayed longer than they initially projected, and no one pressured them to retire before they were ready. (Jt. Appx. 118, Kupp depo. p. 142-143) There is no evidence that Temple targeted Plaintiff (or anyone else) to retire, or that Mr. Kupp's question – whether couched in terms of retirement plans or future plans – implied a motivation to discriminate on the basis of age.

In the absence of any evidence to contradict Temple's stated reasons for laying off Plaintiff for budgetary reasons, the Court should grant Temple's Motion for Summary Judgment.[4]

---

[4]     This motion covers all of Plaintiff's claims in the complaint, namely Plaintiff's claims of discrimination and retaliation under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000 (Count I); the Age Discrimination in Employment Act, as amended, 29 U.S.C. § 623 et seq. (ADEA) (Count II); the Pennsylvania Human Relations Act, as amended, 43 P.S. §951, et seq. ("PHRA") (Count III); and the Philadelphia Fair Practices Ordinance, as amended, Phila. Code § 9-1100, et seq. ("PFPO") (Count IV). The standards for assessing discrimination and retaliation under these statutes are similar, so it is appropriate to consider them together. *Ngai v. Urban Outfitters, 2021 WL 1175155, *7* (E.D.Pa. 2021), citing *Fogleman v. Mercy Hosp., Inc*., 283 F.3d 561, 567 (3d Cir. 2002) and *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 409 (3d Cir. 1999).

**II.     There is no evidence to support Plaintiff's claims of discrimination or retaliation.**

    **A.     Overview of Plaintiff's work history.**

Temple hired Plaintiff Betsy Wolf on March 1, 2005, as an "Administrator II" within the Department of Medicine at Temple's School of Medicine. (Temple-BW-Jt. Appx. 963) Between 2005 and early 2016, plaintiff served as a "Section Administrator" within the Department of Medicine, part of the Temple University Physicians.

In early 2016, when Plaintiff was 65-years of age, Temple promoted her to Senior Administrator of the Department of Family and Community Medicine (Family Medicine). (Jt. Appx. 966-968) TUP's senior leadership group, Mr. Kupp, the Senior Vice Dean for Finance and Administration and Executive Director of the TUP, Lisa Fino, COO, and Greg Zimmaro, the Assistant Dean for Human Resources, made the decision to promote Plaintiff. (Jt. Appx. 93, Kupp depo. p. 42-43)

Family Medicine was one of the two smallest departments in TUP, along with Dermatology, in terms of number of physician faculty and budget. (See chart, Jt. Appx. 1027; Jt. Appx. 68, Wolf depo. p. 52-53) When the leadership team promoted Plaintiff to Senior Administrator of Family Medicine, their plan was to eventually assign her to a larger department or have her take on at least one additional department. (Jt. Appx. 94-95, Kupp depo. p. 46, 49-50) Consistent with this plan, in February 2018, Ms. Fino talked to Plaintiff about assuming the role of Administrator for the Dermatology Department in addition to Family Medicine. It is undisputed

that Plaintiff balked at the prospect of doing so. (Jt. Appx. 800, Fino. depo. p. 159; Jt. Appx. 502,

Zimmaro depo. p. 166-168; Jt. Appx. 67, Wolf depo. p. 48-49).[5]

> **B.  TUP faced chronic budget shortfalls, and took steps each year to increase efficiencies and cut costs.**

TUP experienced chronic budget shortfalls, particularly from 2010 onward. (Jt. Appx. 91,

Kupp depo. p. 34-36) Each year, Mr. Kupp, along with COO Lisa Fino, worked with the clinical

(physician) chairpersons and administrators of the departments to find cost savings and operational

efficiencies to meet the overall TUP budget and the budget of each clinical department. (Jt. Appx.

782, Fino depo. p. 87) Layoffs were an option of last resort (Jt. Appx. 463, Zimmaro depo. p. 12),

but Temple laid off staff as necessary.[6] Mr. Kupp, Ms. Fino and Mr. Zimmaro met together weekly

to review staffing and other issues related to the administration of the TUP. (Jt. Appx. 472,

Zimmaro depo. P. 47) Mr. Kupp explained that the chronic budget shortfall resulted from a

combination of the patient population that the TUP served and the reimbursement system:

> … The basic issue is, and really the ongoing annual issue is that payers, particularly our payer mix, Medicaid primarily, rarely has an increase in rates.  And actually many of our payers on the Medicaid side have had frozen rates for the last probably 15-plus years, and they are the majority of our payers or patients.
>
> As a result, our average revenue increase is about one percent or has been on average per year, when our expenses go up on average three to four percent.  So we have a built-in delta every year, and for the most part we are looking at cuts and ways to streamline and improve our business functions to make up for that three

---

[5]      As noted in Temple's Statement of Undisputed Facts, Ms. Fino testified that she offered Plaintiff the opportunity to take on the role of Administrator for Dermatology and that Plaintiff declined the offer. Plaintiff testified that in her view the conversation was of a more preliminary nature, but admits that she was "resistant" to the idea. Temple submits that for purposes of this Motion, it does not matter whether there was an actual offer or a more preliminary discussion because in either scenario, Plaintiff was at a minimum "resistant" to taking on more responsibility, and such resistance informed Mr. Kupp's later thinking about Plaintiff's position.

[6]      See, e.g, the series of layoff letters from September 2017 (Jt. Appx. 1044-1065) and June 2018 (Jt. Appx. 1029-1041). Lisa Fino testified that she was involved in layoffs since she first came to Temple in 2009. (Jt. Appx. 782, Fino depo. p. 86-87)

> percent delta, which on 150 million -- or actually on a $300 million expense base,
> three percent is about $9 million of potential cuts that have to be made each year.

(Jt. Appx. 91, Kupp depo, p. 35)

Plaintiff, like other departmental administrators, participated in layoffs of staff. See November 19, 2016, layoff letter addressed to Jessica Marrero (Jt. Appx. 1042), and September 9, 2017, layoff letter addressed to Michelle Johnson (Jt. Appx. 1062), both of whom worked in the Family Medicine Department.[7] On June 1, 2018, just a week before her own layoff, Plaintiff, along with then Senior Administrator of the Emergency Department Sharon Mattia, co-signed a layoff letter to Tracy Barnes, who worked for both departments. (Jt. Appx. 1030)

Beginning in approximately 2010, TUP leadership focused on outsourcing and centralizing certain functions to achieve efficiencies, including, among other things, centralizing the "call center" for patients, the billing and follow up collection functions, physician recruitment, marketing, and research administration. Such steps were part of a move toward a shared-service model to streamline work flows in TUP and save money. (Jt. Appx. 88-90, Kupp depo. p. 24-30)

As the TUP consolidated functions and services, TUP leadership also began implementing, where feasible, a shared *administrator* model within the TUP, in which one administrator would cover more than one department. (Jt. Appx. 90, Kupp depo. p. 29-30) For example, as of June 2018, one administrator handled both Neurosurgery and Neurology; another administrator covered both Ophthalmology and Urology. (Jt. Appx. 1027) Similarly, before Plaintiff was promoted to Senior Administrator of Family Medicine, the Senior Administrator of Emergency Medicine had also covered Family Medicine. (Jt. Appx. 94, Kupp depo. p. 45)

As part of the gradual implementation of the shared administrator model, in approximately February 2018, after discussions among Mr. Kupp, COO Lisa Fino and Mr. Zimmaro, Ms. Fino

---

[7]     Ms. Johnson subsequently obtained a position within the Operations department of the TUP.

met with Plaintiff to discuss Plaintiff taking on the Administrator role for the Dermatology Department in addition to Family Medicine. Both departments were small compared with the other departments, and they already shared the same physical space. (Jt. Appx. 131-132, Kupp depo. p. 196-200; Jt. Appx. 782, Fino depo. p.  LF 87-90) At the time, Ms. Fino was handling the Administrator role for Dermatology in addition to her own job. (Id.)

According to Ms. Fino, she met with Plaintiff and offered Plaintiff the opportunity to take on the Administrator role for Dermatology in addition to Family Medicine, and told Plaintiff "it would behoove" her to say yes and take on the added role. Despite the encouragement, Plaintiff declined.[8] (Jt. Appx. 800, Fino. depo. p. 159; Jt. Appx. 502, Zimmaro depo. p. 166-168) Mr. Kupp's understanding from speaking with Ms. Fino was that Plaintiff said that with a new clinical chair of Family Medicine coming on board shortly, she didn't think she could handle working for two departments and two chairs. (Jt. Appx. 137, Kupp depo. p. 220)

Plaintiff admits having the conversation Ms. Fino described, but her version is different. She acknowledges that Ms. Fino talked to her about taking on Dermatology in addition to Family Medicine, and she admits that she was "resistant" to the idea, but she viewed the conversation as more preliminary in nature and not an actual offer. (Jt. Appx. 67, Wolf depo. p. 48-49) Plaintiff acknowledged her resistance to taking on two departments as follows:

> Q.    Did you ever have a discussion with Lisa Fino about possibly taking administrative duties for more than the family medicine practice, specifically for dermatology?
>
> A.    I had a conversation with her, yes.
>
> Q.    And why don't you, in your own words, just tell me what that conversation was?

---

[8]    See footnote 5 on page 4.

A.      She came into my office, sat down next to me, and I can't remember the entire conversation we had prior to it, but then she asked me what did I think about taking over dermatology.


Q.      In addition to family medicine; correct?

A.      Correct.

Q.      And you were resistant to doing that; correct?

A.      Yes.

(Jt. Appx. 67, Wolf depo. p. 48-49)

After Plaintiff declined the offer in February 2018 to take on the Senior Administrator role for the Dermatology Department (or after she was "resistant" about doing so), Plaintiff continued as Senior Administrator of the Family Medicine department (Jt. Appx. 802, Fino depo. p. 166).

In March 2018, Dr. Margot Savoy started as the new clinical chairperson of the Family Medicine Department. Shortly thereafter, she met with all staff members of the Department in a kind of "listening tour," and in that context Plaintiff told Dr. Savoy about the conversation she had had with Ms. Fino about taking on the Administrator role for Dermatology. According to Dr. Savoy, Plaintiff said she had told Ms. Fino that she did not feel she could take on the Dermatology department. (Jt. Appx. 909-910, Savoy depo. 16-17) Dr. Savoy testified that after her conversation with Plaintiff, she spoke with Ms. Fino and Mr. Kupp, who confirmed that Ms. Fino had had a conversation with Plaintiff about becoming the shared administrator for Family Medicine and Dermatology.[9] Mr. Kupp explained to Dr. Savoy how sharing an administrator with Dermatology would work. (Jt. Appx. 910-911, Savoy depo. p. 19-22) Dr. Savoy was not opposed to the idea of having a shared administrator. (Jt. Appx. 138, Kupp depo. p. 222)

---

[9]      See Joint Appendix 1043, referring to a meeting between Mr. Kupp, Ms. Fino and Dr. Savoy to discuss the Administrator role for the Family Medicine Department.

Dr. Savoy testified that in May 2018, as a result of meeting(s) with Mr. Kupp, she was aware that the Family Medicine department was still "pretty far" from being able to meet its budget, and that the department had to close the budget gap.[10] Dr. Savoy discussed possible steps with Mr. Kupp, including laying off staff. (Jt. Appx. 912, Savoy depo. p. 27) Dr. Savoy stated:

> So they talked about that [having a shared administrator with Dermatology] in May. So what they said was that it wasn't confirmed that it had to happen.  They were working on the budget still, but when they went through the budget reconciliation process, our department was pretty far apart.  The gap was large, and then we needed to figure out how we were going to close the gap.

> And on the list of solutions was that you could, you could lay off people that were in the department.  So your front line staff.  You could increase the physician production, which we were already struggling to meet, so that was going to be challenging.  You could share your administrator space, like the administrator model itself.  You could share your office space, which we had already agreed to do with dermatology at that point to lower rent.

> And so we still had a gap even after a lot of our layering.  And so that was one of the last things that was left as an option.

(Jt. Appx. 912, Savoy depo. p. 27)

On June 1, 2018, as part of a series of staff layoffs across the TUP (Jt. Appx. 1029-1041), Plaintiff and Sharon Mattia, the Senior Administrator of the Emergency Medicine Department, jointly signed a layoff letter directed to Tracy Barnes, their shared employee. (Jt. Appx. 1030) Approximately one week after the layoff of Ms. Barnes and other TUP staff, Temple notified Plaintiff that her position was likewise being eliminated and that her employment would end effective June 29, 2018. (Jt. Appx. 1032)

---

[10] "Closing the gap" and "meeting the budget" referred to establishing a budget for the fiscal year beginning July 1, 2018, that fulfilled the needs of the Department and which the Department could actually afford.

Mr. Kupp and Mr. Zimmaro delivered the layoff notice to Plaintiff in a meeting on June 7, 2018. Plaintiff testified that Mr. Kupp told her that the layoff was for "financial reasons." (Jt. Appx. 69, Wolf depo. p. 54) Mr. Zimmaro recalled Mr. Kupp saying that the layoff was due to "budget restraints and operational efficiencies." (Jt. Appx. 463, Zimmaro depo. p. 11-12) Plaintiff's recollection of the conversation was:

> Q.    What is your recollection of what they talked to you about?
>
> A.    My recollection is that they said I was being terminated for financial reasons.
>
> Q.    And did you have any reason to doubt that they had financial reasons?
>
> A.    In all the years I worked at Temple, they had financial reasons.  One year didn't seem to be any different from the next.

(Jt. Appx. 69, Wolf depo p. 54) As an employee laid off for non-performance reasons, Plaintiff received 10 weeks of severance pay. (Jt. Appx. 511, Zimmaro depo. p. 202)

Plaintiff claims that the budget or financial reasons for her layoff were pretextual, and that her layoff, as well as Temple's failure to re-hire her in Fall 2018 and Fall 2019, resulted from age discrimination and/or as a result of retaliation for her complaints regarding a 2017 incident of anti-Semitism. (Jt. Appx. 10-12, Complaint ¶ 47, 65-67)

**C.    The reasons provided to Plaintiff for her layoff were real, and not a pretext for age discrimination.**

Mr. Kupp, Ms. Fino and Mr. Zimmaro all testified that the decision to lay off Plaintiff related to budgetary or financial issues, and that Plaintiff's age was never mentioned in any discussion in connection with laying her off. (Jt. Appx. 139-140, 144-145, 155, Kupp depo. p. 226-229, 248-249, 291; Jt. Appx. 463, Zimmaro depo. p. 11-12; Jt. Appx. 814, Fino depo. p. 213-214) Neither is there any evidence that age played a part in any of the other staff layoffs at any time.

Mr. Kupp, Ms. Fino and Mr. Zimmaro all described the relevant criteria for Plaintiff's layoff as including that she was the least senior of the senior administrators of clinical departments in the TUP, meaning that she was in the role of senior administrator for the shortest time among the senior administrators of clinical departments, and that she had the smallest scope of responsibility among the Senior Administrators in the TUP, meaning that Plaintiff had the smallest department in terms number of faculty and expense base. (Jt. Appx. 144-145, Kupp depo. p. 248-250; Jt. Appx. 466, Zimmaro depo. p. 21-24; Jt. Appx. 814, Fino depo. p. 213-214)

Plaintiff alleges that shortly before her termination, Temple promoted a "substantially younger, less qualified" person into the position of senior administrator. (Jt. Appx. 10-11, Complaint, ¶ 48) Plaintiff was referring to Erin Coleman, who was promoted to Senior Administrator for the Orthopedics Department in May 2018. (Jt. Appx. 73, Wolf depo. p. 70) Plaintiff is correct that Ms. Coleman was less senior than Plaintiff was, but Ms. Coleman was in a special situation because the Clinical Chair for Orthopedics had recently determined that he wanted all of the administrators in the Orthopedics department to have expertise in an area related to Orthopedics, either as an athletic trainer or physical therapist. Ms. Coleman met that special requirement. (Jt. Appx. 491, Zimmaro depo. p. 123-124; Jt. Appx. 832, Fino depo. p. 287-288)[11]

According to Mr. Kupp, he also considered, in the context of Plaintiff's layoff, that Plaintiff was unable or unwilling to take on more responsibility. (Jt. Appx. 145, Kupp depo. p. 249) This refers to the conversation between Ms. Fino and Plaintiff in February 2018 in which they discussed

---

[11]     When Mr. Kupp, Mr. Zimmaro and Ms. Fino testified about the reference to Plaintiff being the "least senior" of the senior administrators, they were not thinking about Ms. Coleman, who was in a special situation because of the decision of the Clinical Chair of the Orthopedics department to require all administrators in that department to either have advanced education or clinical experience as a Physical Therapist or an Athletic Trainer. They each supplemented their testimony on that point in timely errata, and if necessary they would explain such correction in cross-examination. (Jt. Appx. 459, Kupp errata; Jt. Appx. 757, Zimmaro errata; Jt. Appx. 903, Fino errata)

Plaintiff taking on the administrator role for Dermatology in addition to Family Medicine, which Plaintiff declined to do. (Jt. Appx. 145, Kupp depo. p. 249-250)

Among Mr. Kupp, Mr. Zimmaro and Ms. Fino, Mr. Kupp was the boss (Jt. Appx. 463, Zimmaro depo. p. 10; Jt. Appx. 763, Fino depo. p. 12; Jt. Appx. 85, 92, Kupp depo. p. 9, 37), and was the only one who could make layoff decisions, subject to approval of the Dean and University Human Resources. (Jt. Appx. 142-143, Kupp depo. p. 238-244) Mr. Kupp testified that he discussed the possibility of laying off Plaintiff with Mr. Zimmaro and Ms. Fino in Spring 2018 (Jt. Appx. 93, Kupp depo. p. 41-43). Mr. Zimmaro confirmed that timeline, and said that before the decision to lay off Plaintiff, there were multiple discussions about different scenarios that included laying off Plaintiff, among other people, and he recalled that the Plaintiff's potential layoff became part of the discussion late in the fiscal year, between March and June 2018. (Jt. Appx. 465, 468, Zimmaro depo. p. 18-19, 31-32). Mr. Kupp also said that he discussed the possible need to lay off Plaintiff with Dr. Savoy in Spring 2018. (Jt. Appx. 146, Kupp depo. p. 254)

Mr. Kupp ultimately made the decision to lay off plaintiff. (Jt. Appx. 146, Kupp depo. p. 254)[12] Mr. Zimmaro says Mr. Kupp told him about the decision to lay off Plaintiff on June 1, 2018, and Ms. Fino says she learned of the decision shortly before the layoff occurred. (Jt. Appx. 465, Zimmaro depo. p. 18-19; Jt. Appx. 813, Fino depo. p. 209-212) Mr. Zimmaro followed his usual protocol of preparing a termination letter and submitting it to University Human Resources for approval, along with a comparative chart showing other Senior Administrators. (Jt. Appx. 470,

---

[12]     Mr. Kupp said Mr. Zimmaro and Ms. Fino "recommended" and that he made the decision. Mr. Zimmaro and Ms. Fino describe the process somewhat differently, with each seeing themselves as playing a lesser role in Plaintiff's layoff. They all agree that there were ongoing discussions regarding the budget and potential steps to close budget gaps, and they all agree that Mr. Kupp made the actual decision to lay off Plaintiff. This discrepancy about the precise roles of Mr. Zimmaro and Ms. Fino in the layoff does not alter the fact that Mr. Kupp made the decision for the reasons he described.

475, Zimmaro depo. p. 37-39, 58-60) Mr. Zimmaro subsequently received approval from University Human Resources to move ahead with the layoff. (Jt. Appx. 477, Zimmaro depo. p. 67) Mr. Kupp testified that either he or Mr. Zimmaro informed the Dean, Dr. Kaiser, of the layoff, and that Dr. Kaiser approved. (Jt. Appx. 143, Kupp depo. p. 243-244).[13]

Regardless of the precise role of each person, there is no evidence that anyone other than Mr. Kupp, Mr. Zimmaro, Ms. Fino and/or Dr. Savoy played any part in any discussions in Spring 2018 about how to address the Family Medicine Department's budget gap or the possibility of laying off Plaintiff. All decisionmakers testified that the decision was for budgetary reasons.

No decisionmaker mentioned Plaintiff's age in connection with the layoff decision. Likewise, Dr. Kaiser testified that age never came up as a factor in *any* layoff decision when he was Dean of the School of Medicine. (Jt. Appx. 939, Kaiser depo. p. 26)

### D. Temple did not discriminate or retaliate against Plaintiff because of her complaints about Temple's response to the 2017 "swastika incident."

On November 16, 2017, someone drew a swastika on the wall outside Plaintiff's office at the School of Medicine (the "swastika incident"). Temple University Police investigated but did not determine who was responsible. (Jt. Appx. 969-984) A staff member called Lisa Fino who immediately went to the scene and found Plaintiff "distraught." (Jt. Appx. 828-829, Fino depo. p. 272-273) Ms. Fino sent Plaintiff home in an Uber (Id.), and notified Mr. Zimmaro, head of Human

---

[13]     Dr. Kaiser, who left his position as Dean effective January 1, 2021, testified that he had no recollection of discussing Plaintiff's layoff, but said it could have occurred. (Jt. Appx. 935-936, 938-939, Kaiser depo. p. 12-13, 24-25) He also said that Mr. Kupp did not need to submit such layoffs to the Dean for approval. (Jt. Appx. 935, Kaiser depo. p. 12) Temple acknowledges the discrepancy between Dr. Kaiser's testimony that he did not need to approve layoffs within the TUP and Mr. Kupp and Mr. Zimmaro's testimony that they consistently presented layoffs to Dr. Kaiser for his approval. Unlike Mr. Kupp, who oversaw the TUP with its roughly $300 million budget, and Mr. Zimmaro, who oversaw Human Resources within the School of Medicine, Dr. Kaiser was the CEO of the entire Temple University Health System, a $2 billion enterprise. The discrepancy is understandable and does not implicate anyone's credibility, and more importantly, is not germane to the issues in the case which are whether or not Temple discriminated or retaliated against Plaintiff.

Resources for the School of Medicine, who in turn notified other relevant Temple offices, including the "IDEAL" office (Institutional Diversity, Equity, Advocacy & Leadership). (Jt. Appx. 829, Fino depo. p. 276; Jt. Appx. 505-506, Zimmaro depo. p. 180-181; Jt. Appx. 979-982)

On or about December 12, 2017, Tiffenia Archie, Ph.D., Temple's Assistant Vice President for Institutional Diversity, Equity, Advocacy & Leadership, and Eric Brunner, Ed.D., the Assistant Vice President for HR Learning & Development, conducted a sensitivity-type session with the employees who worked in the area where the swastika incident occurred so they could discuss their feelings about it. (Jt. Appx. 1016-1025; Jt. Appx. 505-506, Zimmaro depo. p. 180-181)

Plaintiff believed that Temple's response to the swastika incident was inadequate. (Jt. Appx. 7-10, Complaint, ¶ 23-41). In the days following the swastika incident, Plaintiff complained to the Anti-Defamation League ("ADL"). (Jt. Appx. 7-10, Complaint, ¶ 23-41; Jt. Appx. 985-999) On December 4, 2017, Plaintiff sent or delivered a letter to Dr. Larry Kaiser, the Dean of the School of Medicine, complaining about the swastika incident and Temple's actions (or inaction) in response. (Jt. Appx. 1074) On January 15, 2018, Plaintiff complained by email to Temple's President, Richard Englert, including expressing her belief that Temple had pushed the incident "under the rug" and was more interested in avoiding bad press than it was in protecting and educating the community regarding hate crimes. (Jt. Appx. 1014-1015)

Plaintiff contends that her "consistent complaining" to Dr. Kaiser and Dr. Englert "caused some issue with my superiors." (Jt. Appx. 70, Wolf depo, p. 61) Plaintiff acknowledged, however, that no one at Temple expressed any anger toward her for her complaints to President Englert or Dr. Kaiser (Jt. Appx. 71, Wolf depo, p. 64-65), and no evidence emerged in discovery showing or even suggesting that anyone was upset or annoyed by Plaintiff's complaints. Mr. Kupp recalled that Dr. Kaiser – a Jewish person – was upset about the swastika incident itself, but he was not at

all upset that Plaintiff complained to him in her December 4, 2017, letter. (Jt. Appx. 129, Kupp depo. p. 188)

Mr. Kupp and Mr. Zimmaro never heard that Dr. Kaiser or President Englert were upset, angry or frustrated about Plaintiff's complaints about Temple's response to the swastika incident. (Jt. Appx. 130, Kupp depo. p. 189-193; Jt. Appx. 508, Zimmaro depo. p. 192) Ms. Fino was not even aware of the complaints. (Jt. Appx. 830, Fino depo. p. 277) When asked if anyone at Temple was annoyed with Plaintiff for her complaints Mr. Zimmaro said, "Absolutely not. Actually just the opposite. People were positive saying yeah, good, she can go ahead. It was not a negative." (Jt. Appx. 508, Zimmaro depo. p. 192)

Mr. Kupp was not upset, annoyed or frustrated about Plaintiff's complaints to Dr. Kaiser or President Englert, and neither was Mr. Zimmaro. (Jt. Appx. 130, Kupp depo. p. 189, 192) Both of them testified that Plaintiff's complaints had no impact on, and no connection whatsoever with, the decision approximately five months later to lay off plaintiff. (Jt. Appx. 522-523, Zimmaro depo. p. 248-249; Jt. Appx. 155, Kupp depo. p. 291-292). Nor did Plaintiff's complaints bear on the fact that she was not interviewed or hired when she applied for positions at Temple following her layoff. (Jt. Appx. 155, Kupp depo. p. 291-292)

There is no evidence to contradict the testimony cited above, and no actual evidence suggesting a motive on anyone's part to retaliate against Plaintiff for her complaints.

**E.** **Mr. Kupp's questions about Plaintiff's future plans, or retirement plans, do not support an inference of age discrimination.**

Plaintiff alleges that in the year before her termination, Mr. Kupp "asked her about her retirement plans" and that he said he was asking in order "to plan for the future." Plaintiff says that she told Mr. Kupp that she had no plans to retire at that time. (Jt. Appx. 10, Complaint ¶45-46)

Plaintiff questioned Mr. Kupp, Mr. Zimmaro and Ms. Fino at length about Mr. Kupp asking such questions of Plaintiff, and each said that Mr. Kupp asked all of the Senior Administrators, not just Plaintiff, about their future plans for purposes of succession planning. (Jt. Appx. 513, Zimmaro depo. p. 210; Jt. Appx. 111, Kupp depo. p. 114; Jt. Appx. 817, Fino depo. p. 225) Mr. Kupp testified that succession planning was good business practice, and that he made it a goal for all the staff with whom he worked. (Jt. Appx. 111, Kupp depo., p. 113) Plaintiff subsequently requested the Performance Review documents, referred to as "PDPs," of other individuals Mr. Kupp supervised, as well as those of other TUP Senior Administrators, and those documents confirm that Mr. Kupp included the same "future goal" pertaining to succession planning in virtually all of the PDPs.[14]

When Mr. Kupp asked Plaintiff about her future plans during the 2017 PDP meeting, Plaintiff said she had no plans to retire. Mr. Kupp viewed that as a positive thing because Plaintiff was competent in her job and he hoped they could assign more responsibility to her in the future. (Jt. Appx. 121, Kupp depo. p. 155)

Several of the Senior Administrators of TUP departments, all in their 60s, said during the course of their 2017 performance review meetings that they planned to retire within the next several years, including Kathy Kostic, Denise Reynolds, Maryanne Dennison, Sharon Mattia, Nancy Fox, and Diane Durr. (Jt. Appx. 114-115, 118, Kupp depo. p. 126-131, 142-143; Jt. Appx. 817-819, Fino depo. p. 228-233) The leadership group kept the prospective retirements in mind as they considered how they would cover the departments in the future given the limited resources

---

[14]     The relevant 2016-2017 PDPs are all in the record: Jt. Appx. 1116, D. Reynolds; Jt. Appx. 1121, D. Durr; Jt. Appx. 1126, D. Lampo; Jt. Appx. 1127, F. Wisniewski; Jt. Appx. 1136 K. Kostic; Jt. Appx. 1141, M. Denys; Jt. Appx. 1146, M. Dennison; Jt. Appx. 1151, M. Hueber; Jt. Appx. 1157, N. Fox; Jt. Appx. 1162, S. Mattia; Jt. Appx. 1166, B, Chilnick; Jt. Appx. 1174, F. Erdlen; Jt. Appx. 1178, G. Zimmaro; Jt. Appx. 1184, T. Lubiski).

available. They envisioned that as one or more senior administrators retired, others – including Plaintiff – would take on additional responsibilities as part of the shared administrator model. (Jt. Appx. 122, Kupp depo. p. 159-160)

There is no evidence to suggest that Mr. Kupp or anyone else pressured any of the Senior Administrators who said they had plans to retire to actually follow through when they said they would, and in fact several of the individuals stayed a year or more longer than they initially planned before retiring by choice. (Jt. Appx. 118, Kupp depo. p. 142-143) Two of those individuals, Nancy Fox and Denise Reynolds, were still working as senior administrators at the time of Ms. Fino's deposition. (Jt. Appx. 818-819, Fino depo. p. 232-233) There is no evidence that Mr. Kupp's inquiry to Plaintiff or other Senior Administrators regarding their future plans (or in Plaintiff's words, retirement plans), showed a motive to discriminate on the basis of age.

Plaintiff also tried a different tack during Mr. Kupp's deposition, repeatedly trying to get him to say that if there was pressure to eliminate anyone, he would rather get rid of the older employees and retain the younger ones because they could be expected to stay and provide value for a longer time. Mr. Kupp denied such suggestion, despite the relentless questions, saying that he always tries to make the best business decision based on an employee's experience and contribution. (Jt. Appx. 116, Kupp depo. p. 135-136)

### F. The evidence is undisputed that Temple withdrew each of the job postings to which Plaintiff applied in Fall 2018 and Fall 2019 for reasons unrelated to Plaintiff.

Following her layoff, Plaintiff applied in Fall 2018 and Fall 2019 for posted positions at Temple for which she qualified. (Jt. Appx. 10-12, Complaint, ¶ 48-64) Plaintiff alleges that she was neither interviewed nor hired for any of the positions, and she attributes the failure to interview or hire her to the same discriminatory or retaliatory motives. (Jt. Appx. 12, Complaint, ¶ 65-66)

Temple provided information in discovery to the effect that it withdrew, for reasons unrelated to plaintiff, each of the job postings for which plaintiff applied in late 2018 and 2019, identified as Requisition Nos. 18004030, 18004539 and 18004025, without interviewing or hiring any external candidates. (Jt. Appx. 493-501, Zimmaro depo. p. 132-165; Jt. Appx. 564-567, Plaintiff's Ex. 11) TUP Senior leadership moved employees around internally, and asked senior administrators to pick up additional responsibility, because of the financial situation.  (Jt. Appx. 804, Fino depo. p. 173) Temple reassigned a then-current administrator within the TUP, Colleen McAllister, to take on the responsibilities for the Psychiatry department and she remained in that position (Jt. Appx. 486-487, Zimmaro depo. p. 103-109), and in September 2020, it reassigned a then-current administrator within the TUP, Amala Davis, to become the Senior Administrator for the Family Medicine department and the Dermatology department, after Lisa Fino had covered those two departments since June 2018, in addition to her own job as COO. (Jt. Appx. 769, 810, Fino depo. p. 33, 199) Such reassignment was "net neutral." (Jt. Appx. 836, Fino depo. p. 303)

There is no evidence that Plaintiff's age, or age discrimination, or retaliation for having complained about the swastika incident, played any part in Temple's failure to interview or hire her for any of the job postings for which she applied in late 2018 or 2019.

## III.   Argument

### A.      The Summary Judgment Standard

In *Ngai v. Urban Outfitters*, 2021 WL 1175155 (E.D.Pa. 2021), this Court addressed a motion for summary judgment in the context of a plaintiff who sued his former employer for, among other things, national origin discrimination, age discrimination and retaliation. The Court's thorough description of the applicable summary judgment standard applies equally to this case:

"[S]ummary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Alabama v. North Carolina*, 560 U.S. 330, 344 (2010) (internal quotations marks and citations omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A factual dispute is material, and therefore must be resolved by the jury, only where it "might affect the outcome of the suit under the governing law...." *Id.* at 248. "A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007).

In ruling on a summary judgment motion, a court must "view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion." *Scott v. Harris*, 550 U.S. 372, 378 (2007) (internal quotations marks and alterations omitted). However, "unsupported assertions, conclusory allegations, or mere suspicions" are insufficient to create an issue of fact and defeat summary judgment. *Schaar v. Lehigh Valley Health Servs., Inc.*, 732 F. Supp.2d 490, 493 (E.D. Pa. 2010) (citing *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir. 1989)). A plaintiff cannot avert summary judgment with speculation or by resting on the allegations in his pleadings, but rather must present competent evidence from which a jury could reasonably find in his favor. *Anderson*, 477 U.S. at 248. Finally, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions" and are not to be resolved by the court at summary judgment. *Id.* at 255.

*Ngai*, 2021 WL 1175155, *7.

The Court's description in *Ngai* of each party's burden on motion for summary judgment also applies. Plaintiff cannot meet her burden to show pretext in this case:

### 1. Discrimination Claims

Title VII prohibits employers from discriminating against employees on the basis of, *inter alia*, national origin. 42 U.S.C. § 2000e(a)(1). Similarly, ADEA provides, in relevant part, that "[i]t shall be unlawful for an employer...to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Because Plaintiff must prove discrimination using circumstantial evidence, the burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) applies to his discrimination claims.[6] ...

Under the first step of this framework, the employee bears the initial burden of establishing a *prima facie* case of discrimination by a preponderance of the evidence. *See Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013). Second, if the employee makes out a *prima facie* case, "the burden of production [then] shifts to the defendant to offer a legitimate non-discriminatory [reason] for the adverse employment action." *Id.* (internal quotation marks and citation omitted). "This burden is 'relatively light,' and the employer need only 'introduc[e] evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision.'" *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006) (alteration in original) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 773 (3d Cir. 1994)). In the third and final step of the *McDonnell Douglas* analysis, if the employer offers legitimate, non-discriminatory reasons for its actions, "the burden of production [shifts] back to the plaintiff to provide evidence from which a factfinder could reasonably infer that the employer's proffered justification is merely a pretext for discrimination." *Burton*, 707 F.3d at 426.

Because the pretext analysis is where the rubber meets the road in this case, it requires further elaboration. Plaintiff must make a showing of pretext to defeat an employer's motion for summary judgment. *Id.* at 426-27. To do so, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764. In other words, a plaintiff "may defeat a motion for summary judgment by *either* [1] discrediting the proffered reasons, either circumstantially or directly, or [2] adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Id.* In seeking to discredit the employer's proffered reasons, "the plaintiff cannot simply show that the employer's decision was wrong or mistaken," but rather must show that the reason was a pretext for invidious discrimination. *Id.* at 765. This burden is carried by "demonstrat[ing] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder *could* rationally find them unworthy of credence." *Id.* (internal quotation marks and citation omitted).

\*     \*     \*

## 2. Retaliation Claims

... Title VII prohibits an employer from retaliating against an employee "because he opposed any practice made unlawful by this section...or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. 2000e-3(a); *see also* 29 U.S.C. § 623(d) (materially identical provision in ADEA). The employee bears the initial burden of stating a *prima facie* case of retaliation by establishing that: (1) he engaged in a protected activity; (2) the employer took a materially adverse action against him; and, (3) there was a causal connection between the protected activity

and the employer's action. *Moore v. City of Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006). If the plaintiff makes out a *prima facie* case, then the *McDonnell Douglas* burden-shifting framework kicks in. *Id.* at 342.

2021 WL 1175155, *8-9, 12 (footnote omitted).

With respect to the swastika incident,[15] Plaintiff cannot make out a *prima facie* case because there is no evidence whatsoever of a causal connection between such complaints and her layoff approximately five months later. Alternatively, if the Court finds that Plaintiff established a *prima facie* case, Plaintiff cannot carry her burden of showing a causal connection by "demonstrat[ing] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find" such a causal connection.

With regard to Plaintiff's age discrimination claim, Plaintiff likewise cannot carry her burden on summary judgment of pointing to evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve Temple's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of Temple's action.

---

[15]     It is not clear from the Complaint whether Plaintiff is alleging religious-based discrimination in addition to her claim of retaliation in connection with the swastika incident. When asked about the issue at her deposition, Plaintiff focused on her complaints about what she viewed as Temple's inadequate response, which suggests that her claim is only for retaliation: "I believe the termination was related to my age because of the office administrators and because I continually complained about the fact that they had not done anything about the swastika on my wall and anything to do with the university and the medical school." (Jt. Appx. 71, Wolf depo. p. 63-64)

**B.    The Court should grant summary judgment on Plaintiff's retaliation claim because there is no evidence in the record from which a reasonable jury could find a causal connection between her complaints about Temple's response to the swastika incident and her layoff approximately five months later.**

There is not even a hint of evidence to support the claim of a causal connection between Plaintiff's complaints to the Dean of the Medical School, Dr. Larry Kaiser, or the President of Temple University, Dr. Richard Englert, about Temple's response to the swastika incident and Plaintiff's layoff five months later, which was for budgetary reasons.

Plaintiff complained about Temple's response to the anti-Semitic incident and Temple laid Plaintiff off approximately five months later. There is zero evidence of any causal connection, however. *Ngai* describes the standard for a causal connection for a retaliation claim:

> The Third Circuit has taken a flexible approach to causation, explaining that "a plaintiff may rely upon a broad array of evidence" to establish a causal link between the protected activity and the adverse employment action. *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 283-84 (3d Cir. 2000). Indeed, the Court has advised against taking "too restrictive a view of the type of evidence that can be considered probative of the causal link." *Id.* at 281. "The element of causation, which necessarily involves an inquiry into the motives of an employer, is highly context-specific." *Kachmar v. SunGard Data Sys., Inc.,* 109 F.3d 173, 178 (3d Cir. 1997). **The ultimate question is whether plaintiff's "proffered evidence, looked at as a whole, may suffice to raise the inference" of causation.** *Id.* **at 177. As guidance, the plaintiff may point to an unusually suggestive temporal proximity between the complaint and the adverse employment action, a pattern of antagonism after a complaint, an employer's inconsistent explanation for taking an adverse employment action, or "other evidence gleaned from the record as a whole from which causation can be inferred."** *Farrell,* 206 F.3d at 281-82; *see also Carvalho-Grevious*, 851 F.3d at 260.

2021 WL 1175155 at *13, emphasis added. This Court in *Ngai* found that the plaintiff's evidence was sufficient, at the summary judgment stage, for a reasonable juror to infer a causal connection between the plaintiff's complaints about having his workload and pay reduced, and his termination thereafter. Id. at *14. The Court found that while the temporal proximity alone may not have been sufficient, when seen in light of the documented pattern of antagonism between Mr. Ngai and his

superiors, the evidence was sufficient to withstand summary judgment on the question of retaliation. Specifically, the Court cited the fact that in response to plaintiff's complaints about lack of work and being shut out of meetings, his superiors responded "by suggesting that Plaintiff was too old for this job, would never become a brand director, and should just retire." Id., *14.

In this case, unlike in *Ngai*, there is no evidence of a pattern of antagonism between Plaintiff and her superiors. In fact, the opposite is true.

Plaintiff admitted that no one at Temple expressed anger or disapproval to her about her complaints. (Jt. Appx. 71, Wolf depo. p. 64-65) Mr. Kupp and Mr. Zimmaro testified that not only were they themselves not upset, they also never heard that the Dean, Dr. Kaiser, or the President, Dr. Englert, were upset about the complaints. Plaintiff tried repeatedly to elicit a response from Mr. Zimmaro to the effect that Plaintiff's complaints "reflected poorly" on Temple in some undefined way, but Mr. Zimmaro rejected the suggestion. (Jt. Appx. 507-508, 521-522, Zimmaro depo. p. 187-191, 243-247)

Moreover, it is uncontradicted that in the period between her complaints in late 2017/early 2018 and her termination the following June, TUP leadership offered Plaintiff more responsibility within TUP by becoming the administrator for the Dermatology Department in addition to Family Medicine, which plaintiff declined to do.[16] Regardless whether a factfinder would credit Ms. Fino's version of the conversation, in which she actually offered the position to Plaintiff, or Plaintiff's version, in which the discussion was more preliminary in nature, the attempt to give Plaintiff *more responsibility* within TUP belies the idea that TUP leadership were upset about her complaints and therefore were motivated to retaliate against her.

---

[16]    As discussed above, in Ms. Fino's view she actually offered Plaintiff the opportunity to become the administrator of Dermatology in addition to Family Medicine.

In short, there is neither direct evidence of retaliatory motivation (like the comments in *Ngai* suggesting the plaintiff was too old for his job and should retire), nor any circumstantial evidence, such as unusually suggestive timing or a pattern of antagonism, that could lead a reasonable jury to infer retaliation on Temple's part. In the absence of any evidence of a causal connection, Plaintiff fails to meet her burden of showing a *prima facie* case of retaliation.[17]

For the foregoing reasons, the Court should grant summary judgment on Plaintiff's discrimination and/or retaliation claim related to the swastika incident.

**C.    The Court should grant summary judgment on Plaintiff's age discrimination claim because Plaintiff cannot point to evidence that would lead a jury to disbelieve Temple's stated reasons for Plaintiff's layoff, or find that discrimination was more likely than not a determinative cause of the layoff.**

As the Court outlined in *Ngai*, a plaintiff may defeat an employer's motion for summary judgment on a claim of discrimination either by discrediting the employer's proffered reasons with direct or circumstantial evidence, or by adducing direct or circumstantial evidence that discrimination was more likely than not the motivating or determinative cause of the challenged action.[18]  2021 WL 1175155, *9. Quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994), the *Ngai* Court said the following:

> In seeking to discredit the employer's proffered reasons, "the plaintiff cannot simply show that the employer's decision was wrong or mistaken," but rather must show that the reason was a pretext for invidious discrimination. *Id.* at 765. This burden is carried by "demonstrat[ing] such weaknesses, implausibilities,

---

[17]    Temple anticipates that the Plaintiff may argue that the evidence of what Temple did or did not do in the immediate aftermath of the swastika incident (rather than in response to her complaints) is sufficient to carry her burden of showing a *prima facie* case of discrimination and/or retaliation. Temple disagrees, but if the Court finds in Plaintiff's favor on the question of her burden of establishing a *prima facie* case, she still must adduce sufficient evidence to discredit Temple's stated reasons for laying her off such that a reasonable juror could find that retaliatory animus was the likely reason. *Ngai* at *14. There is no evidence from which a reasonable juror could find discriminatory or retaliatory animus.

[18]    For purposes of this section, Temple will assume that Plaintiff can make out a *prima facie* case of age discrimination. It is unclear whether she is asserting a claim for retaliation under the ADEA. If she is asserting such a claim, it fails at the prima facie stage because she never asserted any predicate complaints related to age.

inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder *could* rationally find them unworthy of credence." *Id.* (internal quotation marks and citation omitted).

2021 WL 1175155, *9. The *Ngai* court noted that under *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 467 (3d Cir. 2005), to show pretext the employee must "present evidence contradicting the core facts put forward by the employer as a legitimate reason for its decision." See also, *Fichter v. AMG Resources Corp.*, 528 Fed. Appx. 225, 228-9 (3d Cir. 2013) (employee may not simply advance an alternative theory for the employer's challenged action, but rather must, under *Kautz v. Met-Pro*, rebut the employer's proffered legitimate reasons for its action.)

Here, Plaintiff has no direct or circumstantial evidence that discredits the legitimate business reasons Temple proffered for her layoff. Temple produced substantial evidence of the chronic financial shortfalls within the TUP, and the multi-layered efforts, year after year, to address them, including centralization, consolidation, outsourcing and layoffs. Plaintiff herself participated in the layoffs of others in 2016, 2017 and 2018, and she admitted that she was told the layoffs were for budgetary reasons. Plaintiff did not engage an expert to reassess or challenge Mr. Kupp's testimony concerning the existence of the shortfalls in the budget, the need for layoffs, or other budget-related measures. Thus, Plaintiff cannot show that Temple's stated reasons for its action were pretextual.

Nor is there any "direct or circumstantial evidence that discrimination was more likely than not the motivating or determinative cause of the challenged action." Plaintiff focused on Mr. Kupp's question about Plaintiff's plans for retirement (or in Mr. Kupp's version, her future plans), to suggest that the question showed a motive to discriminate on the basis of age. However, Mr. Kupp did not target Plaintiff for that question, but rather talked about future plans with all of Plaintiff's cohort of senior administrators for purposes of succession planning. Many of those

25

individuals – seven of whom were in their 60s like Plaintiff – talked about their plans to retire in the next several years, and the uncontradicted evidence shows that no one pressured them to follow through on those plans and several of those individuals actually stayed longer than they planned. Two of those individuals, Nancy Fox and Denise Reynolds, were still working as senior administrators at the time of Ms. Fino's deposition. (Jt. Appx. 818-819, Fino depo. p. 232-233)

Further, Mr. Kupp was pleased when Plaintiff told him she had no plans to retire anytime soon, because he thought she would be able to take on more responsibility in the future. Little did he know that approximately eight months later, in February 2018, when the senior leadership group offered Plaintiff the opportunity to take on more responsibility, she would balk.

Temple anticipates that Plaintiff will likely point to the few inconsistencies that exist in the record and assert that they make Temple's proffered reasons unworthy of credence. The inconsistencies that exist in the record, however, are not material to the claim of retaliation or age discrimination.

For example, there are minor inconsistencies in the testimony of Mr. Kupp, Mr. Zimmaro and Ms. Fino regarding the precise role each played leading up to the decision to lay off Plaintiff. They agree, however, on the key facts related to Plaintiff's layoff, including that Mr. Kupp was the boss among them, that he made the decision on or about June 1, 2018, to lay off Plaintiff for budgetary reasons, and that neither Plaintiff's complaints following the swastika incident nor Plaintiff's age played any part in the layoff decision or the failure to re-hire her thereafter. None of them said anything to support the notion that the budget-related reasons that Temple articulated for Plaintiff's layoff were not the actual reasons, and therefore the minor discrepancies among them are not material to the claims of retaliation or age discrimination and do not support a finding of pretext.

Similarly, some areas of disagreement between Mr. Kupp and Dr. Kaiser emerged in their depositions, but not concerning anything that bears on the issues of retaliation or age discrimination.[19]   Accordingly, the minor inconsistencies in the record do not provide any basis for disbelieving the legitimate budgetary reasons for Plaintiff's layoff that Temple articulated.

The issue involving Erin Coleman likewise does not detract from the credence of Temple's articulated reasons for Plaintiff's layoff. At points during this litigation, Temple referred to the fact that among the considerations leading to Plaintiff's layoff was the fact that Plaintiff was the least senior of the senior administrators of departments within the TUP, and that she had the smallest scope of responsibility, that is, the smallest department in terms of number of faculty and expense base. That statement is true, with the exception of Erin Coleman, who was less senior than Plaintiff.

As both Mr. Zimmaro and Ms. Fino explained during their depositions, Ms. Coleman was promoted to Senior Administrator of the Orthopedics Department in May 2018 as a result of a new requirement that the Chair of Orthopedics, Dr. Eric Kropf, imposed for his department. Specifically, he wanted all of the administrators working in Orthopedics to have clinical expertise in an area of Orthopedics, either as an athletic trainer or physical therapist. Ms. Coleman, already a section administrator in Orthopedics, had expertise as an athletic trainer, and was promoted to Senior Administrator. Other staff lost their positions.

During their depositions, the three decisionmakers referred to Plaintiff as the least senior of the senior administrators, not thinking about Ms. Coleman because the special requirement of being an athletic trainer or physical therapist created a special situation that set her apart. Mr.

---

[19]     Mr. Kupp and Dr. Kaiser testified differently about the reasons for Dr. Kaiser's departure from Temple at the end of 2020, and also regarding whether Mr. Kupp had to get the Dean's approval for layoffs. On the central issues pertaining to retaliation for complaints about the swastika incident or age discrimination, however, Mr. Kupp and Dr. Kaiser agree 100 percent and their testimony supports Temple's proffered reasons for the layoff decision.

Kupp, Mr. Zimmaro and Ms. Fino each corrected their testimony in timely errata. If they were to be cross-examined about the change in their testimony, they would testify exactly as set forth in the errata. Nothing about the testimony or errata casts doubt on the legitimate reasons that Temple articulated regarding Plaintiff's layoff.

> **D.     There is no evidence that Temple did not re-hire Plaintiff for discriminatory reasons.**

Temple withdrew each of the job postings for which Plaintiff applied in Fall 2018 and Fall 2019 without interviewing or hiring any external candidates. Mr. Zimmaro testified extensively on the subject, and the documents that Temple supplied in discovery confirm his testimony. (Jt. Appx. 493-501, Zimmaro depo. p. 132-165; Jt. Appx. 564-567, Plaintiff's Ex. 11)

Ms. Fino likewise described the practice of moving existing employees around within TUP to achieve the necessary coverage because of the financial situation. (Jt. Appx. 804, Fino depo. p. 173) Assigning an existing administrator (Colleen McAllister) to take on responsibility for the Psychiatry department in addition to Pathology, and promoting an internal candidate (Amala Davis) to cover Family Medicine and Dermatology after Ms Fino had covered those positions for two years in addition to her own job, were part of that pattern. Simply put, Plaintiff has no evidence to support her claim that discrimination or retaliation led to her non-rehire in 2018 and 2019.

## IV.    Conclusion

At the close of an aggressive discovery period with multiple depositions of key personnel and thousands of pages of documents produced, Plaintiff has no evidence whatsoever to cast doubt on the legitimate budgetary reasons for Plaintiff's layoff and non-rehire that Temple articulated, nor any basis to infer that discrimination was the real motivation for Temple's actions. Accordingly, Temple requests that this Court grant summary judgment in its favor.

RESPECTFULLY SUBMITTED,

Dated:  November 19, 2021          /s/ Michael E. Sacks
                                   NEIL J. HAMBURG
                                   MICHAEL E. SACKS
                                   ID. NO. 32175, 39774
                                   HAMBURG LAW GROUP, PLLC
                                   1 Franklin Town Blvd, Suite 1106
                                   Philadelphia, PA  19103
                                   (215) 432-1411

                                   Attorneys for Defendant
                                   Temple University

## CERTIFICATE OF SERVICE

I certify that the foregoing Motion for Summary Judgment, Statement of Undisputed Facts, and Memorandum of Law have been filed electronically and are available for viewing and downloading on the Court's CM/ECF system. I further certify that a copy of the Motion, Statement of Undisputed Facts and Memorandum of Law are being served electronically upon:

> Caren N. Gurmankin, Esquire
> Console Mattiacci Law, LLC
> 1525 Locust Street, 9th Floor
> Philadelphia, PA 19102
>
> gurmankin@consolelaw.com
>
> Attorneys for Plaintiff Betsy Wolf

Date:  November 19, 2021                    /s/ Michael E. Sacks
                                            MICHAEL E. SACKS