IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____
BETSY WOLF,                          :
                                     :
                Plaintiff,           :     CIVIL ACTION
                                     :
TEMPLE UNIVERSITY,                   :     NO. 2:21-cv-00866
                                     :
                Defendant.           :
_____    :

**Temple University's Responses to Plaintiff's
Statement of Additional Facts in Support of Her
Opposition to Temple's Motion for Summary Judgment**

1.      Greg Zimmaro, Assistant Dean for Human Resources and Administration in the
School of Medicine, has overseen and been responsible for the Human Resources function for the
School of Medicine since around 2002. (Jt. Appx. 467, Zimmaro Dep. 28:1-14; Jt. Appx. 85, Kupp
Dep. 9:6-14.)

**Response:      Undisputed.**

2.      As Assistant Dean of Human Resources and Administration, Zimmaro is the
highest level person at the School of Medicine who handles the Human Resources function. (Jt.
Appx. 516, Zimmaro Dep. 226:17-20.)

**Response:      Undisputed.**

3.      Zimmaro was born in July 1952. (Jt. Appx. 462, Zimmaro Dep. 7:20-21.)

**Response:      Undisputed.**

4.      Thomas Kupp is the Senior Vice Dean for Finance and Administration for
Defendant's School of Medicine. Kupp's responsibilities include overseeing the Human Resources
function. (Jt. Appx. 84, Kupp Dep. 7:8-8:16.)

**Response:      Undisputed.**

5.      Kupp has worked at Defendant since 2003 and, other than a change from Vice Dean
to Senior Vice Dean, nothing has changed about his position since that time. (Jt. Appx. 84, Kupp
Dep. 7:17-8:22.)

**Response:** **Undisputed that Mr. Kupp said nothing has changed "with that title."**

6.      Kupp was born in October 1958. (Jt. Appx. 84, Kupp Dep. 7:1-2.)

**Response:** **Undisputed.**

7.      In his capacity as Senior Vice Dean for Finance and Administration for the School of Medicine, Kupp is essentially the Chief Operating Officer for the school. He oversees all of the administrative non-research, non-education, and non-clinical functions of the school. (Jt. Appx. 86, Kupp. 14-5-15.)

**Response:** **Undisputed.**

8.      Kupp reported to Dr. Larry Kaiser, Dean of the School of Medicine, up until about two to two and a half years ago. (Jt. Appx. 86, 14:20-12; Jt. Appx. 935, Kaiser Dep. 10:24-11:4.)

**Response:** **Undisputed.**

9.      According to Kupp, Kaiser told him that his contract was not renewed and that the Board was not happy with his performance with regard to the finances of the health system and, as a result, wanted a change in direction. (Jt. Appx. 87, Kupp Dep. 18:1-19.)

**Response:** **Undisputed.**

10.      According to Kaiser, Kupp's testimony that Kaiser told him that his contract was not renewed and that the Board was not happy with his performance with regard to the finances of the health system and, as a result, wanted a change in direction was not true, that he had never told that to Kupp. (Jt. Appx. 935, Kaiser Dep. 9:24-10:13.)

**Response:** **Undisputed. By way of further answer, the discrepancy between Mr. Kupp's testimony and Dr. Kaiser's testimony on this point is not material to Temple's motion.**

11.      Lisa Fino was employed at Defendant as Chief Operating Officer for Temple University physicians in 2009 through January 2021. (Jt. Appx. 763, Fino Dep. 12:11-13:7.)

**Response:** **Undisputed.**

12.     Fino was born in December 1958. (Jt. Appx. 762, Fino Dep. 7:9-10.)

**Response:     Undisputed.**


13.     As Chief Operating Officer for Temple University physicians, Fino was responsible for the day-to-day operations of the practices, including having responsibility for the physicians in the practices, making sure that the chairs had what they needed to run their practices efficiently, working closely with HR and Finance, and working with the administrators. (Jt. Appx. 764, Fino Dep. 13:9-20.)

**Response:     Undisputed.**


14.     As Chief Operating Officer from 2009 through January 2021, Fino oversaw all of the departments (e.g., Gastroenterology) and practice areas for each department (e.g., the various locations or offices in which the Gastroenterology Department practices). (Jt. Appx. 764, Fino Dep. 15:12-16:10.)

**Response:     Disputed, however the dispute is not material to the motion for summary judgment. By way of further response, Ms. Fino clarified that Gastroenterology is actually a section within the Department of Medicine. (Jt. Appx. 764, Fino Dep. 15:18-24.)**


15.     The administrators reported directly to Kupp, but had an unofficial dotted line reporting relationship to Fino. (Jt. Appx. 765, Fino Dep. 18:14-19:10.)

**Response:     Undisputed.**


16.     Plaintiff was born in December 1950. (Jt. Appx. 57, Pl. Dep. 6:22-23.)

**Response:     Undisputed.**


17.     Plaintiff is Jewish. (Jt. Appx. 57, Pl. Dep. 6:24-7:1.)

**Response:     Undisputed.**


18.     Plaintiff started working at Defendant in March 2005 as a multi-section Administrator. (Jt. Appx. 63, Pl. Dep. 33:20-24.)

**Response:     Undisputed.**

19.     When Plaintiff started at Defendant, she oversaw the Department of General Internal Medicine, the residency practice of general internal medicine, rheumatology; endocrinology, dermatology, and hospital medicine. (Jt. Appx. 64, Pl. Dep. 34:7-14.)

**Response:      Undisputed.**

20.     When Plaintiff was promoted into the Senior Administrator position for the Department of Family Medicine in May 2016, as a Senior Administrator, she had more authority over things than she did as Administrator, including creating the budget for the Department herself. (Jt. Appx. 64, Pl. Dep. 35:11-36:16; Jt. Appx. 65, 38:11-17.)

**Response:      Undisputed.**

21.     Plaintiff had been acting in the capacity as a Senior Administrator prior to her promotion. (Jt. Appx. 1621-1622.)

**Response:      Disputed, but the dispute is not material to Temple's motion for summary judgment. For clarity, the upgrade in level that Plaintiff received effective May 1, 2016, reflected that from the time she assumed Department Administrator role for Family Medicine in approximately late 2015 (See Jt. Appx. 7, Complaint ¶ 20), her responsibilities were consistent with those of all other Departmental Administrators who held the T29 Senior Administrator position, so her position was upgraded from T28 to T29.  (Jt. Appx. 1621)**

22.     Specifically, as Senior Administrator, Plaintiff was fully in charge of the budget and the hiring and firing of employees. She dealt with the City of Philadelphia, including the City's Vaccines for Children Program, which is a program that provides free vaccines for the underserved, underprivileged families. Plaintiff had to keep very strict records, make sure that the Department was fully stocked with vaccines and monitor the refrigeration of the vaccines, she had to work with the medical assistants to purchase and ensure that they staffed all of their vaccines appropriately. She also oversaw the supplies that the Department purchased, worked with the front desk, worked with Information Technology. Essentially, Plaintiff did everything "other than doctor work". (Jt. Appx. 65, Pl. Dep. 41:5-42:20.)

**Response:      Undisputed.**

23.     Plaintiff was promoted into the position of Senior Administrator for Family Medicine because she was "a very good section administrator in the departments that she had and this was a growth opportunity for her." (Jt. Appx. 771, Fino Dep. 43:13-18.)

**Response:      Undisputed.**

24.     Plaintiff's 2016 Performance Review for the period July 2015 through June 2016 was done by Thomas Kupp and Lisa Fino. (Jt. Appx. 1611.) A note on the review states that, "Lisa Fino completed Betsy's evaluation as Betsy worked closely with Lisa and/or reported to her for a good portion of the year; edits/comments and FY17 goals and objectives were added by Tom Kupp." (Jt. Appx. 1611.)

**Response:     Undisputed.**

25.     Plaintiff's final rating on her 2016 Performance Review was Meets Expectations. (Jt. Appx. 1611.)

**Response:     Undisputed.**

26.     Fino wrote a comment on Plaintiff's 2016 Performance Review that, Betsy has had two transitions this past year – Section Administrator of GI to TUP Operations to Senior Administrator in Family Medicine. Her overall strengths and broad knowledge of not only Administrator functions but also Operations and Project Development were evidence through the transitions and will prove valuable in her new role as Senior Administrator. (Jt. Appx. 1611.)

**Response:     Undisputed.**

27.     Kupp wrote a comment on Plaintiff's 2016 Performance Review that, Betsy has been through a number of transitions over the past year. Her wealth of experience in operations has served her well, and made her move into Family Medicine relatively seamless. Despite the challenges in Family Medicine, Betsy has done an outstanding job working through the issues while staying focused on the ultimate client – the patient. Betsy – thank you for your willingness to be flexible. I look forward to working with you in FY17. (Jt. Appx. 1611.)

**Response:     Undisputed. (Note, there is a minor and immaterial omission in the quoted comment that does not affect its meaning.)**

28.     On the "Essential Functions" section of Plaintiff's 2016 Performance Review, Plaintiff was rated "Exceeds Expectations". (Jt. Appx. 1612.)

**Response:     Undisputed.**

29.     Fino's comment in the "Essential Functions" section of Plaintiff's 2016 Performance Review was, Betsy continues to ensure that the key financial metrics are met, despite at times, difficult pushback in the department. She always keeps the patient first and looks for

opportunities to improve the patient experience. In her time in Operations she helped with Quality Initiatives that have now carried over into her role in Family Medicine. She is instrumental in ensuring quality initiatives are carried out in the department.
(Jt. Appx. 1612.)

**Response:** **Undisputed.**

30.    On the "Goals and Projects" section of Plaintiff's 2016 Performance Review, Plaintiff was rated "Meets Expectations". (Jt. Appx. 1613.)

**Response:** **Undisputed.**

31.    Fino's comment in the "Goals and Projects" section of Plaintiff's 2016 Performance Review was, For the short time that Betsy was in TUP Operations, she was an integral member of the general operations and also our Quality team as we were developing processes and protocols to meet payer metrics. Betsy continued to look for opportunities to improve workflow and efficiencies. (Jt. Appx. 1613.)

**Response:** **Undisputed.**

32.    On the Competencies Section of Plaintiff's 2016 Performance Review, Plaintiff was rated as follows:

Client/Customer Service Orientation: Exceeds Expectations
Continuous Improvement: Exceeds Expectations
Creativity and Innovation: Exceeds Expectations
Developing Others/Supervision: Meets Expectations
Ethics: Exceeds Expectations
Interpersonal Skills: Meets Expectations
Leadership: Meets Expectations
Problem Solving/Decision Making: Exceeds Expectations
Professionalism: Exceeds Expectations
Resilience and Adaptability: Exceeds Expectations
Resource and Project Management: Meets Expectations
Respect and Valuing Diversity: Exceeds Expectations
Teamwork and Collaboration: Meets Expectations

(Jt. Appx. 1614.)

**Response:** **Undisputed.**

33.     Fino's comment in the "Competencies" section of Plaintiff's 2016 Performance Review was, Betsy is always patient centered. She easily adapts to any situation and identifies resolutions that are consistent with Temple's core mission. (Jt. Appx. 1614.)

**Response:     Undisputed.**

34.     Plaintiff's 2017 Performance Review for the period July 2016 through June 2017 was done by Thomas Kupp and Dr. Steve Permut, Chair of Family Medicine. Dep. Ex. P-28, 445. A note on the review states that the "evaluation was completed by Dr. Steve Permut (Chairperson of Family Medicine); edits/comments added by Thomas Kupp (TUP Executive Director)." Id.

**Response:     Undisputed.**

35.     Plaintiff's final rating on her 2017 Performance Review was Exceeds Expectations. (Jt. Appx. 1616.)

**Response:     Undisputed.**

36.     Kupp wrote a comment on Plaintiff's 2017 Performance Review that, Betsy has exceeded expectations, managing the Department through a period of continued change – including the planned retirement of the Chairperson, and a practice move from the MOB to Jones Hall. Betsy – I appreciate all that you do for the Department of Family Medicine and its patients. (Jt. Appx. 1616.)

**Response:     Undisputed.**

37.     On the Essential Functions section of Plaintiff's 2017 Performance Review, she was rated Exceeds Expectations. (Jt. Appx. 1616.)

**Response:     Undisputed.**

38.     Dr. Permut's comment in the Essential Functions section of Plaintiff's 2017 Performance Review was that, having a full time administrator has added consistency to the department and promoted teamwork and collaboration. Betsy has worked with TUP Operations in meeting quality goals as designated by the payers and/or Population Health. She goes out of her way to be sure that the Department's clinical focus is on patient care. She supports the Department and TUP in ensuring that budgetary targets are met – charges, payments and w RVUs. (Jt. Appx. 1617.)

**Response:     Undisputed.**

39.     On the Goals and Projects section of Plaintiff's 2017 Performance Review, Plaintiff was rated Exceeds Expectations. (Jt. Appx. 1617.)

**Response:       Undisputed.**

40.     Dr. Permut's comment in the Goals and Projects section of Plaintiff's 2017 Performance Review was, Betsy has done a fine job working with a new department. (Jt. Appx. 1618.)

**Response:       Undisputed.**

41.     On the Competencies Section of Plaintiff's 2017 Performance Review, Plaintiff was rated as follows:

> Client/Customer Service Orientation: Exceeds Expectations
> Continuous Improvement: Exceeds Expectations
> Creativity and Innovation: Meets Expectations
> Developing Others/Supervision: Meets Expectations
> Ethics: Exceeds Expectations
> Interpersonal Skills: Meets Expectations
> Leadership: Exceeds Expectations
> Problem Solving/Decision Making: Exceeds Expectations
> Professionalism: Exceeds Expectations
> Resilience and Adaptability: Significantly Exceeds Expectations
> Resource and Project Management: Meets Expectations
> Respect and Valuing Diversity: Exceeds Expectations
> Teamwork and Collaboration: Exceeds Expectations

(Jt. Appx. 1618-1619.)

**Response:       Undisputed.**

42.     On the Future Goals and Projects section of Plaintiff's 2017 Performance Review, one of her goals was, "Begin development of a succession plan." (Jt. Appx. 1620.)

**Response:       Undisputed.**

43.     According to Kupp, based on Plaintiff's 2016 and 2017 performance reviews, Plaintiff was an employee whom Defendant would want to retain. (Jt. Appx. 109, Kupp. Dep. 107:20-24.)

**Response:     Undisputed.**

44.     Dr. David O'Gurek, Associate Professor, Department of Family & Community Medicine, Director of Urban Community Health at the Center for Bioethics, Urban Health, and Policy, wrote Plaintiff a recommendation letter dated July 24, 2018. (Jt. Appx. 1638-1639.)

**Response:     Undisputed.**

45.     Dr. O'Gurek's recommendation letter for Plaintiff stated as follows:

Dear Prospective Employer:

It is my pleasure to provide this recommendation letter on behalf of Betsy Wolf in strong support of her application for your position. By way of background, I worked with Ms. Wolf during her tenure as our department administrator for Temple University Physicians. Therefore, I can comment directly on Betsy's performance in clinical management, staff oversight, and organizational design and planning.

Ms. Wolf's curriculum vitae portrays an exceptionally experienced health administrator, having held numerous roles during her time with Temple. With each experience, she clearly amassed a significant level of administrative knowledge that was apparent from her earliest days in our department. In my initial conversations with her, I was instantly impressed by her quick and keen ability to assess the current climate and circumstances of the department and develop a strategy to address areas of need. She is keenly able to assess troubleshoot areas as not simply problems but rather, see them as opportunities to make a positive impact on the surroundings for all involved. These characteristics make her a leader within our department during a time of transition but also a team-player who pitched in to fill voids where necessary and create stabilization during what could have been a tenuous time.

In addition to her clear grasp of management, her understanding of process and flow was clearly palpable in her desire to create stronger standardization and workflows in the clinical setting. She brought experience from prior successes and failures; however, she also brought an openness and interest in innovation to allow for both positive change which encouraged staff input, thus improving staff morale. These characteristics are critical in a health administrator now who must ensure that the entire team seeks a common goal.

As a patient advocate in all that I do, I also come to think of a strong administrator as someone who also values patient advocacy in what they do. In fact, from my perspective, it is essential to managing health operations. Through both my own interactions as well as those observed in other circumstances, I can think of countless times where Betsy went

above and beyond for patients, seeking to rectify concerns and issues, and notably ensuring that patients felt heard. Her administrative support in this arena paved the way for a clinical and department climate that ensured patients were the priority. The same Betsy is there to "go to bat" for her staff and those she supports to advance the internal missions and goals.

In summary, Ms. Wolf possesses many salient characteristics that will ensure her success as an administrator within your organization. Her experience brings much to the table, her willingness to embrace change will foster innovation, and her caring demeanor will ensure a patient-centered environment that maintains the integrity and mission of health care. Based on my observations as well as my personal experience working with her, I recommend her highly for your current position and ask that you take her application under serious consideration.

Should you have any additional questions or concerns, please feel free to contact me at any time.

(Jt. Appx. 1638-1639.)

**Response:**    **Undisputed.**


46.    Diane Clark, Director, Patient Access, wrote Plaintiff a recommendation letter dated July 30, 2018. (Jt. Appx. 1637.)

**Response:**    **Undisputed.**


47.    Ms. Clark's recommendation letter for Plaintiff stated as follows:

To Whom It May Concern:

It is with great privilege that I write to you in recommendation of Betsy Wolf for a position with your company. I find her to be an intelligent, pleasant, dependable, courteous person who is always looking to learn.

Betsy was employed at Temple University Physicians for a number of years in various Administrator positions. Her latest position was as Senior Administrator for the Family and Community Medicine Department. She works well with all levels of employees and she is highly conscientious in the planning, follow-through and organization of projects. I have worked with Betsy in her multiple Administrator roles at Temple University Physicians since she started at Temple a number of years ago. As the Director of Patient Access, I depend on Administrators to keep their schedules current and at least six months ahead as well as have any department nuances well documented for the schedulers. This is not an easy task but any department Betsy was involved, I could be sure that I had all the information needed.

I feel Betsy would be an asset to any company and do not hesitate to recommend her for a position at your company.

(Jt. Appx. 1637.)

**Response:**      **Undisputed.**


48.      Greg Zimmaro testified that Plaintiff was a good employee. (Jt. Appx. 463, Zimmaro Dep. 12:20-22.)

**Response:**      **Undisputed.**


49.      Fino testified that Plaintiff's strengths were that she was a good administrator; she was strong; she knows the financial pieces; she knows the operational pieces of a practice; she knew Defendant because she had been employed at Defendant for a long time; she had experience prior to working at Defendant; and, she was "very competent." (Jt. Appx. 812, Fino Dep. 207:17-208:3.)

**Response:**      **Undisputed.**


50.      According to Fino, Plaintiff was "absolutely" an "asset to Temple". (Jt. Appx. 812, Fino Dep. 208:24-209:1.)

**Response:**      **Undisputed.**


51.      Dr. Savoy, the Chair of Family Medicine as of around March 2018, never said anything to Fino about Plaintiff that was negative in terms of her performance or her interactions with doctors or staff. (Jt. Appx. 808, Fino Dep. 191:16-20.)

**Response:**      **Undisputed.**


52.      Fino never heard from anyone at Defendant that Dr. Savoy had said anything negative or made any complaints or expressed any concerns about Plaintiff's performance or her interactions with the doctors or the staff. (Jt. Appx. 808, Fino Dep. 191:22-192:3.)

**Response:**      **Undisputed.**


53.      During Plaintiff's 2017 performance review meeting, Kupp asked her what her plans were for retirement. Pl. Dep. 56:13-18. Plaintiff was sixty six (66) years old at the time. (Jt. Appx. 69, Pl. Dep. 56:19-21.)

**Response:**     **Disputed, but the dispute is not material to Temple's motion for summary judgment. As addressed in Temple's Statement of Undisputed Facts (SUF) and Memorandum of Law, Mr. Kupp testified that he asked Plaintiff about her "future plans," as he did with other administrators, for purposes of succession planning. Temple relies on the discussion of this issue in its SUF and Memorandum of Law regarding why Mr. Kupp's question about plaintiff's future plans does not implicate age-related discrimination or discriminatory motivation on his part.**

54.     Plaintiff was taken aback by Kupp's question about her retirement plans. She told him that she had no plans to retire, that she needed the job, that she loved the job, and that she was staying. (Jt. Appx. 69, Pl. Dep. 57:6-16.)

**Response:**     **Undisputed that Plaintiff testified consistent with SOAF 54.**

55.     Kupp testified that, as of 2017, he assumed that Plaintiff was over the age of fifty (50) based on how she looked. (Jt. Appx. 109, Kupp Dep. 108:1-15.)

**Response:**     **Undisputed. By way of further answer, Mr. Kupp said that he did not know how old Plaintiff was in 2016 and 2017, and does not check employees' ages. His testimony was:**

**Q.     Okay. And as of this time period, 2016 and 2017, you knew approximately how old Miss Wolf was?**

**A.     Actually, I really didn't know how old she was during that time. I don't check dates of employees.**

**Q.     Did you know she was over the age of 50?**

**A.     I assume she was over 50.**

**Q.     Did you know she was over 60?**

**A.     No.**

**Q.     Why do you assume she was over 50?**

**A.     I think it is why anybody assumes, based upon their perception of age of people.**

**Q.     Okay, how she looked?**

**A.**      **How she looked, yes.**

**(Jt. Appx. 109, Kupp depo. p. 108)**

56.      Plaintiff alleged in her Complaint that, "In the year prior to Plaintiff's termination, Kupp had asked her about her retirement plans. He said that he was asking in order to be able to plan for the future." (Docket No. 1, Pl. Compl. at ¶ 45.)

**Response:**      **Undisputed.**

57.      Kupp denied that the part of Paragraph 45 of Plaintiff's Complaint stating that, "In the year prior to Plaintiff's termination, Kupp had asked her about her retirement plans." (Jt. Appx. 120, Kupp Dep. 152:18-23.)

**Response:**      **Undisputed that Mr. Kupp denied asking plaintiff about her "retirement plans," however Mr. Kupp acknowledged asking Plaintiff about her "future plans." (Jt. Appx. 120, Kupp Dep. 153.)**

58.      Kupp denied ever asking Plaintiff about her retirement plans prior to Plaintiff's termination in June 2018. (Jt. Appx. 120, Kupp Dep. 152:24-153:3.)

**Response:**      **Undisputed that Mr. Kupp denied asking plaintiff about her "retirement plans," however Mr. Kupp acknowledged asking Plaintiff about her "future plans." (Jt. Appx. 120, Kupp Dep. 153.)**

59.      Kupp admitted that, when he gave Plaintiff her 2017 performance evaluation, he asked her about her future plans and they discussed succession planning. (Jt. Appx. 121, Kupp Dep. 153:4-12.)

**Response:**      **Undisputed.**

60.      Kupp said that in the meeting, he asked Plaintiff about succession planning. Specifically, he indicated that he wanted to talk to Plaintiff about succession planning for the Department and what her future plans were. (Jt. Appx. 121, Kupp Dep. 153:13-154:12.)

**Response:**      **Undisputed.**

61.      Kupp admitted that by "future plans", he meant: Did she want to continue as the Senior Administrator? Did she want to go back to being the section administrator? Was she happy

13

being a section administrator? Was she going to plan to retire? (Jt. Appx. 121, Kupp Dep. 154:13-20.)

**Response:**      **Undisputed.**

62.      In response, Plaintiff told Kupp that she had no plans to retire any time soon. (Jt. Appx. 121, Kupp Dep. 154:21-24.)

**Response:**      **Undisputed.**

63.      Kupp does not dispute the part of Paragraph 45 of Plaintiff's Complaint that states, "He said that he was asking in order to be able to plan for the future." (Docket No. 1, Pl. Compl. at ¶45; Jt. Appx. 122, Kupp Dep. 158:24-159:11.)

**Response:**      **Undisputed. For clarity, the correct citation to the Joint Appendix for the question and answer concerning the quoted portion of paragraph 45 of the Complaint is Jt. Appx. 122, Kupp depo. p. 158, lines 3-15.**

64.      In discussions with the administrators about succession planning in 2017, the following employees told Kupp that they planned to potentially retire within the next one (1) to three (3) years: Sharon Mattia; Denise Dennison; Kathy Kostic; Doug Lampo; Diane Durr; Denise Reynolds; Nancy Fox. (Jt. Appx. 122, Kupp Dep. 159:19-160:13; Jt. Appx. 123, 164:4-13.)

**Response:**      **Undisputed.**

65.      As of May 1, 2018, there were thirteen (13) Senior Department Administrators, including (Jt. Appx. 1585.)

**Response:**      **Disputed, but dispute is not material to Temple's motion for summary judgment. By way of further answer, the chart set forth at Jt. Appx. 1585 appears to be missing entries for the Senior Administrator of Orthopedics and Senior Administrator for Urology.**

66.      As of May 1, 2018, eight (8) of the thirteen Senior Department Administrators were sixty (60) years of age or older. (Jt. Appx. 1585.)

**Response:**      **Undisputed that eight of the Senior Department Administrators shown on Jt. Appx. 1585 were sixty (60) years of age or older.**

67.     Sharon Mattia was born in April 1951, making her sixty six (66) years old in 2017. (Jt. Appx. 1585.)

**Response:      Undisputed.**

68.     Kathleen Kostic was born in August 1951, making her sixty six (66) years old in 2107. (Jt. Appx. 1585.)

**Response:      Undisputed.**

69.     Denise Dennison was born in July 1949, making her sixty eight (68) years old in 2017. (Jt. Appx. 1585.)

**Response:      Undisputed.**

70.     Diane Durr was born in November 1950, making her sixty seven (67) years old in 2017. (Jt. Appx. 1585.)

**Response:      Undisputed.**

71.     Denise Reynolds was born in January 1956, making her sixty one (61) years old in 2017. (Jt. Appx. 1585.)

**Response:      Undisputed.**

72.     Doug Lampo was born in November 1950, making him sixty seven (67) years old in 2017. (Jt. Appx. 1586.)

**Response:      Undisputed.**

(unnumbered).        Nancy Fox was born in February 1955, making her sixty two (62) years old in 2017. (Jt. Appx. 1585.)

**Response:      Undisputed.**

73.     The list of Senior Administrators as of May 1, 2018 included:

•      Denise Reynolds, then age sixty two (62);
•      Kenneth Lee, then age fifty three (53);

- Kathleen Kostic, then age sixty six (66) ;
- Maryanne Dennison, then age sixty eight (68);
- Nancy Fox, then age sixty three (63);
- Mark Denys, then age forty nine (49);
- Frances Wisniewski, then age sixty (60);
- Thomas Lubiski, then age forty four (44);
- Maureen Hueber, then age fifty two (52);
- Diane Durr, then age sixty seven (67);
- Sharon Mattia, then age sixty seven (67);
- Mishalene Fisher, then age forty three (43);
- Plaintiff, Betsy Wolf, then age sixty seven (67).

(Jt. Appx. 1585.)

**Response:** **Undisputed.**


74.     Kathy Kostic retired from Defendant approximately around early 2020. (Jt. Appx. 819, Fino Dep. 233:18-234:14.)

**Response:** **Undisputed.**


75.     Sharon Mattia retired from Defendant. (Jt. Appx. 819, Fino Dep. 234:16-21.)

**Response:** **Undisputed.**


76.     By 2020, the list of Department Administrators included:

- Erin Coleman, born in June 1983, making her thirty seven (37) years old as of 2020;
- Amala Davis, born in December 1975, making her forty five (45) years olf as of 2020;
- Colleen McAllister, born in January 1965, making her fifty five (55) years old as of 2020;
- Danielle Bryan, born in November 1990, making her thirty (30) years old as of 2020.

(Jt. Appx. 1586.)

**Response:** **Undisputed.**

77.    Zimmaro never asked Kupp whether he had asked Plaintiff about her retirement plans. (Jt. Appx. 513, Zimmaro Dep. 210:13-17; 218:17-21.)

**Response:**    **Disputed, but dispute is not material to Temple's motion for summary judgment. Mr. Zimmaro first testified that he did not recall asking Mr. Kupp if he had asked Plaintiff about her retirement plans, (Jt. Appx. 513, Zimmaro Dep. 210:13-17), and in response to further questioning he said that he "never talked to Tom about what's in this document," referring to the Complaint. (Jt. Appx. 515, Zimmaro depo. p. 218:17-21) By way of further answer, throughout this line of questioning, despite Plaintiff's repeated questions trying to elicit concern on Mr. Zimmaro's part about Mr. Kupp or his questions to employees, Mr. Zimmaro emphasized that Mr. Kupp does not target older employees and has never exhibited bias against older employees. (Jt. Appx. 515, Zimmaro depo. p. 210-220)**

78.    Zimmaro agreed that there are managers who may have a bias against older employees even if they do not expressly state that they have that bias. (Jt. Appx. 516, Zimmaro Dep. 221:19-222:2.)

**Response:**    **Undisputed that Mr. Zimmaro agreed that hypothetically, "there could be people like that" (i.e, managers who are biased even if they do not expressly state that they have such bias). By way of further response, Mr. Zimmaro only answered Plaintiff's hypothetical question after repeatedly stating that he had no such concern about Mr. Kupp, and no such concern in regard to Mr. Kupp's discussion with Plaintiff "because I was involved with the whole process and I know why it unfortunately ended up being Betsy because of the financial, budgetary, operational limitations that department. (Jt. Appx. 515, Zimmaro depo. p. 210-222, quoted section on deposition p. 221)**

79.    As of March 2018, Zimmaro knew that Plaintiff was over the age of sixty (60). (Jt. Appx. 470, Zimmaro Dep. 37:5-8.)

**Response:**    **Undisputed. By way of further response, Mr. Zimmaro said that he knew Plaintiff was over the age of 60 "[o]nly because she had made reference to the fact." (Jt. Appx. 470, Zimmaro depo. p. 37:10-11)**

80.    Fino denied knowing how old Plaintiff was at the time that she learned that the decision had been made to terminate Plaintiff's employment. (Jt. Appx. 816, Fino Dep. 223:4-7.)

**Response:**    **Undisputed.**

81.    Fino denied knowing that Plaintiff was over the age of sixty (60) and "surmise[d]" but said that she did not know whether Plaintiff was over the age of fifty (50). (Jt. Appx. 816, Fino Dep. 223:8-12.)

**Response:    Undisputed.**

82.    Fino then testified that she thought that Plaintiff was in her fifties. (Jt. Appx. 816, Fino Dep. 223:13-16.)

**Response:    Undisputed. By way of further response, Ms. Fino said:**

**A.    I was thinking maybe 50. I don't know. Somewhere in the 50s.**

**Q.    You thought she was around 50?**

**A.    Well, to be honest with you, I didn't really think about it at all. I mean I didn't think what age she is. I don't think like that.**

**(Jt. Appx. 816, Fino depo., p. 223:13-16.)**

83.    Fino subsequently testified that she had no idea how old Plaintiff was as of the time of her termination and, when asked if Plaintiff could be forty (40) years old, said, "I don't know." In response to a question about whether she thought that Plaintiff was over fifty (50), Fino responded that she believed that Plaintiff was over fifty (50). (Jt. Appx. 816, Fino Dep. 223:17-224:19.)

**Response:    Undisputed. By way of further response, Ms. Fino repeatedly said that she did not think about Plaintiff's age. In response to Plaintiff's repeated questions, she estimated Plaintiff was in her 50s. (Jt. Appx. 816, Fino depo., p. 223-224)**

84.    Fino knew that Plaintiff had adult children and that the fact that Plaintiff had grandchildren may have come up in conversation. (Jt. Appx. 816, Fino Dep. 224:24-225:2.)

**Response:    Undisputed.**

85.    As part of Fino's performance evaluation discussion with Kupp when she was fifty nine (59) years old (in around 2016), Kupp asked her if she had any plans to retire. (Jt. Appx. 819, Fino Dep. 235:6-237:8.)

**Response:    Disputed, but the dispute is not material to Temple's motion for summary judgment. By way of further response, in the portion of her deposition cited, Ms. Fino said she could not recall whether it was in the context of the**

performance evaluation or in a separate discussion, but at some point Mr. Kupp asked her about her retirement plans. In regard to the performance evaluation, Ms. Fino described the conversation as follows:

Q.    What did you discuss with him as part of that discussion in your evaluation meeting?

A.    For me it was where did I see myself in five to ten years. I want to get that MOB [medical office building] up and running. That's why I came here. I'm still here. I hope I don't die before the MOB gets up and running. I mean literally that was the discussion. I came here to implement EPIC, which I did. I came here to do another Perelman Center like I did at Penn, and I'm still waiting for the MOB. And that was the conversation. I mean that was the goal and I was hoping that I was still here and that we would get the MOB up and running.

Q.    Anything else about that discussion with --

A.    I mean I don't remember anything else specific about that except that that was, you know, where I saw us, where I saw me trying to still be here for the MOB. And I liked my job and that was it.

**(Jt. Appx. 819, Fino depo., p. 235-236)**

86.    Fino understood Kupp's question about her retirement plans to help him understand what her future plans were and how long she planned on being at Defendant. (Jt. Appx. 820, Fino Dep. 239:7-11.)

**Response:    Undisputed.** By way of further response, Ms. Fino and Mr. Kupp have a good working relationship and rapport. For context, Ms. Fino's testimony reads:

Q.    Okay. All right, and when he asked you what your retirement plans were, whether it was in the performance evaluation discussion or a separate discussion, do you recall whether anyone else was present or it was just the two of you?

A.    Just the two of us.

Q.    Okay, and what did you say when he asked you what your retirement plans were?

A.    I said, for God's sake, I have kids that are costing me a fortune. I'll probably be here until I am 100.

Q.    That is literally what you said word for word?

19

**A.**      **Literally what I said word for word, because it is true. I might have to correct that because I think it was I might be here until 100 or die. I wasn't sure which one was going to occur first.**

**Q.**      **Okay.**

**A.**      **But I do know that was basically it.**

**Q.**      **Okay. Did he say anything in response?**

**A.**      **He laughed at me.**

**Q.**      **And you understood that he was asking in the context of doing succession planning so he could understand what your future plans were and how long you planned on being at Temple?**

**A.**      **Correct.**

**(Jt. Appx. 820, Fino depo., p. 238-239)**

87.      Some of the administrators came to Fino and told her that Kupp asked them what their retirement plans were. (Jt. Appx. 821, Fino Dep. 244:5-16.)

**Response:**      **Undisputed. By way of further response, one of those that Ms. Fino recalled was someone "who I think is a little bit younger laughing, coming to me and laughing and saying ha-ha, oh, well, that was a funny question." (Jt. Appx. 821, Fino depo., p. 244, lines 18-22)**

88.      The administrators who came to Fino to tell her that Kupp was asking them about their retirement plans expressed that they thought that it was a "little strange" that Kupp was asking them about their retirement plans. (Jt. Appx. 821, Fino Dep. 244:23-12.)

**Response:**      **Undisputed.**

89.      Some of the who came to Fino to tell her that Kupp was asking them about their retirement plans "were a little put out" by Kupp's questioning them about their retirement plans and that they thought that the questions were "odd". (Jt. Appx. 821, Fino Dep. 247:2-24; 248:2-13.)

**Response:**      **Undisputed.**

90.     The administrators who came to Fino to tell her that Kupp was asking them about their retirement plans included Kathy Kostic; and, Denise Reynolds. (Jt. Appx. 821-822, Fino Dep. 244:23-247:16.)

**Response:     Undisputed.**

91.     Fino does not recall mentioning to Zimmaro that Kupp was asking employees about their retirement plans. (Jt. Appx. 823, Fino Dep. 249:1-8.)

**Response:     Undisputed.**

92.     When certain of the administrators advised Kupp of their intention to retire, he was able to develop succession plans for them because they had advised of their intention to retire in advance. (Jt. Appx. 793, Kupp Dep. 130:16-132:4.)

**Response:     Undisputed that Mr. Kupp testified that with respect to certain individuals who had advised of their intention to retire, succession plans were developed. (Note, the correct citation is to Jt. Appx. 115, not 793)**

93.     All of the administrators for whom Kupp was able to develop succession plans because they advised of their intent to retire were over the age of sixty (60). (Jt. Appx. 793, Kupp Dep. 132:11-17.)

**Response:     Undisputed. By way of further response, Mr. Kupp's actual testimony was that he believed they were, or assumed they were, over the age of 60. (Note, the correct citation is to Jt. Appx. 115, not 793)**

94.     Kupp testified as follows in connection with his ability to develop succession plans for employees who advised him of their intent to retire:

Q.     And from a good business practice, that was helpful because it allowed you to have time to develop succession plans for these individuals before their retirements became effective?

A.     Correct.

(Jt. Appx. 793, Kupp Dep. 132:5-10.)

**Response:     Undisputed. (Note, the correct citation is to Jt. Appx. 115, not 793)**

95.     Kupp admitted that, during his entire employment at Defendant, no one younger than their late fifties had ever advised of their intention to retire. (Jt. Appx. 794, Kupp Dep. 133:3-7.)

**Response:     Undisputed. (Note, the correct citation is to Jt. Appx. 116, not 794)**

96.     During his entire career, Kupp was not aware of anyone younger than their late fifties advising of their intention to retire. (Jt. Appx. 794, Kupp Dep. 133:19-23.)

**Response:     Undisputed. (Note, the correct citation is to Jt. Appx. 116, not 794)**

97.     Kupp admitted that, generally speaking, retirement is something that is limited to those that are older than fifty (50). (Jt. Appx. 794, Kupp Dep. 134:1-4.)

**Response:     Undisputed. (Note, the correct citation is to Jt. Appx. 116, not 794)**

98.     Kupp acknowledged that one of the factors that he would consider when planning for the future for his organization at Defendant is how long he thinks that an employee is going to work at Defendant. (Jt. Appx. 796, Kupp Dep. 141:17-142:1.)

**Response:     Disputed, but the dispute is not material to and does not weigh against Temple's motion for summary judgment. By way of further response, the "fact" attributed to Mr. Kupp mischaracterizes his testimony. The appropriate context can be seen by reviewing Mr. Kupp's full testimony from page 134 to 142 of his deposition, and Temple urges the Court to read those pages. In that series of questions and answers, Plaintiff repeatedly tried to get Mr. Kupp to say, in connection with his testimony about succession planning, that he would prefer to retain an employee who, by virtue of his or her age, has 15-20 years left in his or her work life, as opposed to someone who has two to three years left in his or her work life. Mr. Kupp repeatedly disputed Plaintiff's suggestion that he would prefer to retain the younger employee, and tried to explain his position, but Plaintiff persisted in trying to twist his testimony otherwise. Mr. Kupp explained that he would always try to make the best business decision based upon an individual's experience and contribution to the organization (Jt. Appx. 116, Kupp depo. p. 135); that he doesn't really look at the number of years left that a person has if they are valuable to the organization (Jt. Appx. 116, Kupp depo. p. 136); that he looks at individuals' experience and contribution to determine what makes the most sense, and that ultimately what people do is their decision (Jt. Appx. 117, Kupp depo. p. 138); that he looks at multiple things, most importantly an employee's contribution (Jt. Appx. 117, Kupp depo. p. 140); and finally that he would consider, as one of multiple things, how long he thinks someone is going to**

**work. Mr. Kupp emphasized that how long he thought someone would work "would not be a high priority." (Jt. Appx. 116-118, Kupp depo. p. 134-142)**

99.     On or about November 16, 2017, Plaintiff arrived at work to find a swastika drawn right outside her office. (Jt. Appx. 1624; Jt. Appx. 69, Pl. Dep. 57:22-58:13.)

**Response:     Undisputed.**

100.     Zimmaro had no idea as to whether Defendant followed through on its representation that it would look into installing surveillance cameras in the lobby of Plaintiff's office building following the swastika incident. (Jt. Appx. 509, Zimmaro Dep. 194:7-195:13.)

**Response:     Disputed, but the dispute is not material to Temple's motion for summary judgment. By way of further response, Mr. Zimmaro testified that he did not know whether Temple had said it would look into installing surveillance cameras in the lobby of the building where Plaintiff worked, and he likewise did not know if Temple in fact looked into installing surveillance cameras. (Jt. Appx. 509, Zimmaro depo. at p. 194-195)**

101.     Zimmaro had no idea as to whether Defendant actually did install surveillance cameras in the lobby of Plaintiff's office building following the swastika incident. (Jt. Appx. 509, Zimmaro Dep. 196:21-197:4.)

**Response:     Undisputed.**

102.     While Zimmaro was aware that Defendant did a "sensitivity session" with employees following the swastika incident, he had no idea of what was involved. (Jt. Appx. 509, Zimmaro Dep. 195:15-196:11.)

**Response:     Undisputed.**

103.     Plaintiff sent a letter to Dr. Kaiser via hand delivery on or about December 4, 2017 regarding the swastika incident and Defendant's seriously deficient response. (Jt. Appx. 1074) The letter is pasted below:

December 4, 2017

HAND DELIVERED

Dear Dr. Kaiser:

The swastika on the side of my office door in Jones Hall was first noticed on November 16 by two members of my staff.  When they showed it to me, I was devastated.

But that was only the beginning.

Temple security came quickly, and the officer filled out a report noting the swastika as "vandalism." Yes, it was vandalism, but it targeted me as a Jewish employee.  Shouldn't this have been noted as a hate crime?

I was advised by Lisa Fino and Greg Zimmaro to go home.  I was truly shaken.  I stayed home the next day, and it was charged against me as a sick day. I was told that Temple security had spoken with the security staff in Jones Hall, but no one had seen anything. Then silence.

I called the Anti-Defamation League, and they contacted the head of Temple Security. A day or so later, I spoke with Charlie Leone. We talked about all the follow-up that needed to happen: training, communication, investigation. Then, silence.

To the best of my knowledge, no one on my staff (Family Medicine) or the staff that shares our space (Dermatology) has been interviewed. There has been no communication to the staff about the incident and about the seriousness of hate crimes. There has been no communication to the Temple community about hate crimes. I have heard from a number of doctors about how upset they were by the incident and the lack of communication.

Silence.

Surely, it seems that this crime is being treated as a secret. Please let me know otherwise. I have been deeply hurt, and the lack of response has only made the pain worse.

**Response:      Undisputed.**


104.    On January 15, 2018, Plaintiff sent a letter to Defendant's President, Richard Englert, stating the following:

Dear President Englert
In your recent communications to the Temple community about hateful posters on or near the Temple campus, I was disappointed that you did not include the incidents or swastikas appearing on the door of a Jewish employee on the Health Sciences Campus and on an RA's door on the Main Campus over the past 2 months.

One of those doors was mine. The immediate response to that incident was woefully lackluster, unsupportive and frankly appeared to be pushed under the rug. The Temple police recorded it as a case of criminal mischief and not the hate crime that it truly was and then let any further investigation drop. This prompted me to send a letter to Dr. Kaiser regarding his grossly inadequate response and only then did any action take place.

Four weeks after the incident, the Faculty and staff in my immediate department (Family & Community Medicine) were engaged in conversation with the Institutional Diversity, Equity, Advocacy and Leadership Department where they asked everyone to discuss how they felt about the swastika. They stated they were very upset that it took so long to address this issue and were confused as to why no one from the other clinical department in Jones Hall were brought to the meeting. They felt that the lack of action or communication with them spoke volumes. The Temple community, on the Health Science campus, were never informed of this hate crime and no educational program was implemented to teach about hate crimes and to reinforce the no tolerance policy for this type of criminal activity.

The Temple Police tell me the investigation is on-going. As of today, the undercover detectives have been here twice, speaking only to a handful of staff.

I am more than disappointed in the way this matter has been handled. It reflects poorly in that it appears to be more important for Temple to avoid bad press than to uphold the principles of tolerance, educate about hate crimes, and keep its own community safe from racial and ethnic threats.

Thank you so much.

Sincerely,
Betsy

(Jt. Appx. 1014-1015)

**Response:**        **Undisputed.**

105.    According to Zimmaro, Plaintiff's e-mail to President Englert consisted of her complaining that Defendant handled the swastika incident poorly and that she was dissatisfied with its response. (Jt. Appx. 522, Zimmaro Dep. 244:13-17; 245:20-21.)

**Response:**        **Undisputed. This "fact" attributed to Mr. Zimmaro – that Plaintiff's letter to President Englert complained about Temple's handling of the swastika incident and expressed Plaintiff's dissatisfaction – is plain from the letter itself. By way of further response, Temple urges the Court to review this portion of Mr. Zimmaro's deposition transcript in which Plaintiff relentlessly attempted to get Mr. Zimmaro to testify that Plaintiff's complaints to the Anti-Defamation League, to Dr. Kaiser and to President Englert "reflected poorly" on Temple, which Mr. Zimmaro repeatedly resisted. Plaintiff's questions regarding whether Plaintiff's complaints "reflected poorly" on Temple were not intended to discover actual information about what Mr. Zimmaro did or what he thought, or what others did or thought, but rather to provide Plaintiff with a useful "sound bite" that to imply that Mr. Zimmaro or his colleagues were upset about Plaintiff's complaints because they "reflected poorly" on**

**Temple and/or those charged with responding to the swastika incident. Plaintiff asked Mr. Zimmaro no fewer than 11 times about the complaints "reflecting poorly" on Temple – four times initially (See Jt. Appx. 507-508, Zimmaro depo. p. 187-190), and seven additional times later. (Jt. Appx. 521-522, Zimmaro depo. p. 243-247).**

106.   Kupp learned from either Fino or Zimmaro that Plaintiff reached out to President Englert because she was not happy with Defendant's response to the swastika incident. (Jt. Appx. 129, Kupp Dep. 186:18-187:6.)

**Response:   Undisputed.**

107.   Kupp denied that he was upset when he learned that Plaintiff had reached out to President Englert in connection with Defendant's response to the swastika incident. (Jt. Appx. 130, Kupp Dep. 189:12-17.)

**Response:   Undisputed.**

108.   Kupp denied that he was getting frustrated with what he was hearing about Plaintiff's continued complaints about Defendant's handling of the swastika incident. (Jt. Appx. 130, Kupp Dep. 192:16-193:1.)

**Response:   Undisputed.**

109.   Kupp never reached out to Plaintiff in connection with the swastika incident. (Jt. Appx.128, Kupp Dep. 184:22-24.)

**Response:   Undisputed. By way of further response, Mr. Kupp testified that because it was an upsetting incident, and Plaintiff was close with Ms. Fino, he thought that it was "best to let Lisa be the interface." (Jt. Appx. 128, Kupp depo. p. 184)**

110.   When Fino was asked at her deposition whether Plaintiff was ever offered the position of handling the administrator responsibilities for Dermatology (in addition to her Family Medicine responsibilities), Fino testified as follows:

Q.   Was there any point where she was offered the position of handling the administrator responsibilities for dermatology?

A.   It was discussed.

Q.      Was there any point when she was offered the position of handling administrator duties for dermatology?

A.      It was discussed.

Q.      So is that a no?

A.      It was discussed.

Q.      Okay. Was she offered it?

A.      I told her it would behoove her to take the dermatology position.

Q.      Was that an offer or a discussion?

A.      I said it would behoove you.

Q.      Okay. I am asking was she ever offered the position of taking on administrator responsibilities for dermatology?

A.      It depends how you interpret "behoove."

Q.      Well, how do you interpret behoove, Ms. Fino, was it an offer or no?

A.      I determine it is. I was trying to look out for her and saying it would behoove you to take that position.

Q.      Okay. So she was made an offer?

A.      (Witness nods.)

Q.      Is that yes or no?

A.      I'll say yes.

(Jt. Appx. 770, Fino Dep. 37:5-38:8.)

**Response:      Undisputed.**


111.    Fino testified that she made an offer to Plaintiff to take on the administrator responsibilities for Dermatology in February 2018. (Jt. Appx. 770, Fino Dep. 39:17-40:9.)

**Response:      Undisputed.**

112.    That discussion between Fino and Plaintiff in February 2018 about Plaintiff possibly taking on the administrator responsibilities for Dermatology came about because the School of Medicine was looking at having administrator handle more than one department in certain situations, i.e., unless the department that they handled was a particularly large one and where possible. (Jt. Appx. 773, Fino Dep. 49:6-21; 55:24-56:5.)

**Response:**        **Undisputed. By way of further response, Ms. Fino attempted to explain at her deposition that there was an effort, over time, to have administrators handle more than one department where it made sense to do so. Her testimony included:**

**Q.        Why are you having a discussion with Betsy in February 2018 about taking on administrator responsibilities for dermatology in addition to family medicine?**

**A.        We were having a lot of reductions across the board over a number of years and we were looking at changes in the model with the administrators, and family medicine and derm were very, very small departments.**

**(Jt. Appx. 773, Fino depo. p. 49)**


113.    Fino had been aware of discussion about possibly having administrators handling more than one department since around 2010. (Jt. Appx. 773, Fino Dep. 51:3-52:15.)

**Response:**        **Undisputed that Ms. Fino referred to 2010 in the context cited. By way of further response, she also said, multiple times, that she wasn't clear about when the discussion about having administrators handle more than one department began, that it was "an evolution," that the discussion had been going on for "a good period of time," and that there were "a number of discussions over the years."  (Jt. Appx. 773-774, Fino depo. p. 49-55)**


114.    As of February 2018, there was no administrator for Dermatology. Although Fino was handling those responsibilities as of that time, it was not a long-term solution as she had her COO job to do. (Jt. Appx. 782, Fino Dep. 88:13-89:3.)

**Response:        Undisputed.**


115.    According to Fino's deposition testimony, Fino, Zimmaro, and Kupp made the decision to extend an offer to Plaintiff for a newly created position of Senior Administrator of Family Medicine and Dermatology. (Jt. Appx. 782, Fino Dep. 89:5-13; 89:23-90:17.)

**Response:**    Undisputed in part, disputed in part, but the dispute is not material to Temple's motion for summary judgment. It is undisputed that Ms. Fino testified that she, Mr. Zimmaro and Mr. Kupp decided to offer Plaintiff the opportunity to take on the role of senior administrator for Dermatology in addition to Family Medicine. Temple disputes the portion of SOAF 115 referring to a "*newly created position of Senior Administrator of Family Medicine and Dermatology.*" By way of further response, Plaintiff's repeated reference to a "*newly created position of Senior Administrator of Family Medicine and Dermatology*" is a misnomer intended to distract and confuse the issue by suggesting that if there was not a "*newly created position of Senior Administrator of Family Medicine and Dermatology,*" or if such a position did not "*exist,*" then there was no offer to Plaintiff. That overly formalistic view ignores the substance of Ms. Fino's testimony in which she described a less formal process in which administrators were asked to take on additional responsibilities, and that when Ms. Fino talked to Plaintiff about taking on the additional responsibility of the Dermatology department, Plaintiff balked at doing so. In testimony that spans more than 60 pages of her deposition (Jt. Appx. 783-798, Fino depo. p. 89-150), and with great frustration, Ms. Fino tried to answer Plaintiff's questions on this issue by explaining the reality of how things worked.

Q.    Okay. Was there a position, was there a position that existed, senior administrator of dermatology and family medicine, at the time that you are having this conversation with Betsy Wolf in February 2018 about how it would behoove her to take on the administrator duties for dermatology in addition to her family medicine responsibilities?

MR. SACKS: Object to the form, but go ahead and answer.

THE WITNESS: I can't answer it because that's not how we worked. There were a number of department, multi-specialty administrator positions that came about. They weren't official, oh, post this, go here and do this. They were a series of conversations that happened over a period of time based on changes that were going on in the practice.

(Jt. Appx. 786, Fino depo. p. 102) And a short time later she testified:

THE WITNESS: As I stated again, there was nothing posted. The goal was to move dermatology and family med together and have one administrator based on the size of the departments. As a result of looking at all the sizes of the departments, I had the discussion with Betsy regarding dermatology and family medicine.

Q.    Does the fact that nothing was posted mean that a combined position for family medicine and dermatology had not been created as of the time you are having this discussion with Betsy in February 2018?

**MR. SACKS: Object to the form. Go ahead.**

**THE WITNESS: If we combined, if we posted a position for dermatology and family medicine, where would that leave Betsy?**

**BY MS. GURMANKIN:**

**Q.    I don't understand that, but it certainly wasn't an answer to my question. The fact that nothing was posted per your testimony, does that mean that a combined position of family medicine and dermatology had not been created as of the time that you are having this discussion with Betsy in February 2018?**

**MR. SACKS: Object to the form for the 700th time.**

**THE WITNESS: We had a lot of discussions with a lot of administrators about picking up additional responsibility. Okay? Not formalized. It's what we did. I go back to ENT, ophthalmology and urology. Discussion about we need you to pick up another department based on size and scope and that's how things worked here.**

**Similar discussion with Betsy about family med and dermatology. That's how we did it.**

**If there was already somebody in a small role, we would go to them and combine departments. That's the only thing -- I mean that's the only way I can answer it.**

**(Jt. Appx. 794-795, Fino depo. p. 136-138)**

116.    Fino testified as follows:

Q.    Was a new position created senior administrator of family medicine and dermatology at some point around February of 2018?

…..

A.    I will answer again. There was nothing formally created. To me in my world create means that there was something officially documented that says you are now or we are looking for an administrator for family, in this case family med and dermatology.

Was there anything formally documented, and to me that means created, and the answer would be no.

…..

Q.     Was there anything that was – was the position created without being officially documented?

A.     It wasn't created.

(Jt. Appx. 784, Fino Dep. 95:1-96:1.)

**Response:     Undisputed that Plaintiff correctly quoted the foregoing testimony. Temple incorporates its response to No. 115.**

117.   Fino testified that the discussion that she had with Plaintiff in February 2018involved her telling Plaintiff that it would "behoove her" to take both family medicine and dermatology. (Jt. Appx. 785, Fino Dep. 99:14-21.)

**Response:     Undisputed.**

118.   Plaintiff did not Fino using the word "behoove" in that discussion. (Jt. Appx. 68, Pl. Dep. 50:12-20.)

**Response:     Undisputed. (Temple assumes that Plaintiff meant to say "Plaintiff did not *recall* Fino using the word…")**

119.   As of February 2018, a Senior Administrator position for Family Medicine and Dermatology was not posted. (Jt. Appx. 786, Fino Dep. 103:16-17.)

**Response:     Undisputed. Temple incorporates its discussion at SOAF 115 above.**

120.   According to Fino, if a position is not posted, then that position does not exist. (Jt. Appx. 786, Fino Dep. 103:16-104:4; 105:16-20; 112:9-17.)

**Response:     Undisputed in part, disputed in part, but the dispute is not material to Temple's motion. It is undisputed that Ms. Fino said the words attributed to her. Temple incorporates its discussion at SOAF 115 above regarding Plaintiff's mischaracterization of Ms. Fino's testimony.**

121.    As of February 2018, according to Fino, a position of Senior Administrator for Family Medicine and Dermatology had not been created "on paper". (Jt. Appx. 793, Fino Dep. 129:24-130:6; 130:13-17.)

**Response:**        **Undisputed in part, disputed in part, but the dispute is not material to Temple's motion. It is undisputed that Ms. Fino said the words attributed to her. Temple incorporates its discussion at SOAF 115 above regarding Plaintiff's mischaracterization of Ms. Fino's testimony.**

122.    Fino testified as follows:

Q.    But my question is, as of February 2018 when you were having this behooves conversation with Betsy Wolf, had a combined position for family medicine and dermatology been created?

....

A.    I have to again say it was a crap shoot what was going to happen around here. So whether it was going to be family med and derm, which made logical sense again based on the size and the location, it seemed like that was the way we were going to go. It is hard to answer your question about created when we were moving everything around to try to keep people okay.

(Jt. Appx. 793, Fino Dep. 131:1-16.)

**Response:**        **Undisputed in part, disputed in part, but the dispute is not material to Temple's motion. It is undisputed that Ms. Fino said the words attributed to her. Temple incorporates its discussion at SOAF 115 above regarding Plaintiff's mischaracterization of Ms. Fino's testimony.**

123.    Fino subsequently testified as follows:

In 2018, going back to February, we were looking at the roles and responsibilities of all of the administrators. We knew we had a gap in dermatology. We also knew that dermatology and family med were together. And family med was a very, very small department.

Led us to the discussion of should Betsy cover dermatology and family med versus bringing somebody else in to run yet another very, very, very small department.

As a result of that discussion, had the discussion with Betsy about dermatology and family medicine. That's exactly how it played out.

(Jt. Appx. 795, Fino Dep. 140:2-15.)

**Response:       Undisputed.**

124.    According to Fino, while there was discussion as of February 2018 about combining the administrator responsibilities for Family Medicine and Dermatology, a decision had not yet been made to do so. Jt. Appx. 795, Fino Dep. 140:16-141:3.

**Response:       Disputed, but the dispute is not material to Temple's motion. By way of further response, Ms. Fino's testimony in the section cited was that a decision had not been "formalized." Temple incorporates its discussion at SOAF 115 above regarding Plaintiff's mischaracterization of Ms. Fino's testimony.**

125.    Fino testified as follows:

Q.      So as of the time that you are discussing, you are having this discussion with Betsy in February 2018, you believe there is a very strong possibility or a very strong likelihood that family medicine and dermatology will be combined from an administrator perspective, but that decision has not yet been made; correct?

A.      That is correct.

(Jt. Appx. 795, Fino Dep. 145:15-22.)

**Response:       Undisputed that Ms. Fino said the words attributed to her. Temple incorporates its discussion at SOAF 115 above regarding Plaintiff's mischaracterization of Ms. Fino's testimony.**

126.    As of the time of Fino's discussion with Plaintiff in February 2018 about taking on the administrator responsibilities for Dermatology in addition to Family Medicine, a final decision has not yet been made to combine those roles into one senior administrator position. (Jt. Appx. 798, Fino Dep. 149:18-23.)

**Response:       Undisputed in part, disputed in part, but the dispute is not material to Temple's motion. It is undisputed that Ms. Fino said that she was 99 percent sure they would combine the two departments under one administrator, but that things could always change. (Jt. Appx. 798, Fino depo. p. 149:4-8) Temple incorporates its discussion at SOAF 115 above regarding Plaintiff's mischaracterization of Ms. Fino's testimony.**

127.    There is no documentation regarding any discussions that Fino, Kupp, and Zimmaro had about combining administrator responsibilities for Family Medicine and Dermatology in early 2018. (Jt. Appx. 798, Fino Dep. 150:19-151:2.)

**Response:    Undisputed.**


128.    Fino did not document her February 2018 discussion with Plaintiff in any way. (Jt. Appx. 804, Fino Dep. 174:8-12.)

**Response:    Undisputed.**


129.    There is no documentation regarding the decision to combine the senior administrator role for Family Medicine and Dermatology. (Jt. Appx. 812, Fino Dep. 205:15-22.)

**Response:    Undisputed. Temple incorporates its discussion at SOAF 115 above regarding a so-called "*newly combined Senior Administrator position for Family Medicine and Dermatology.*"**


130.    There is no documentation indicating that Zimmaro and/or Kupp authorized Fino to make an offer for a newly combined Senior Administrator position for Family Medicine and Dermatology. (Jt. Appx. 852, Fino Dep. 366:13-19.)

**Response:    Undisputed. Temple incorporates its discussion at SOAF 115 above regarding a so-called "*newly combined Senior Administrator position for Family Medicine and Dermatology.*"**


131.    There is no documentation indicating that Plaintiff was offered, at any point, a newly combined Senior Administrator position for Family Medicine and Dermatology. (Jt. Appx. 852, Fino Dep. 366:20-367:2.)

**Response:    Undisputed. Temple incorporates its discussion at SOAF 115 above regarding a so-called "*newly combined Senior Administrator position for Family Medicine and Dermatology.*"**


132.    According to Fino, following is what occurred during the February 2018 discussion with Plaintiff about taking on administrator responsibilities for Dermatology in addition to Family Medicine:

Betsy and I were sitting in my office. I was sitting at my desk and she was sitting across from my desk.

34

We were having discussion about family med and I was talking about the practices, and at that time I said we were looking at some of the organization and it would behoove you to look at picking up dermatology.

(Jt. Appx. 800, Fino Dep. 157:5-19.)

**Response:**     **Undisputed.**


133.     According to Fino, Plaintiff responded that she wasn't interested and that Family Medicine was a lot to handle. (Jt. Appx. 800, Fino Dep. 159:14-18; 161:7-21.)

**Response:**     **Undisputed.**


134.     Plaintiff's testimony on this issue is as follows:

Q.     And why don't you, in your own words, just tell me what that conversation was?

A.     She came into my office, sat down next to me, and I can't remember the entire conversation we had prior to it, but then she asked me what did I think about taking over dermatology.

Q.     In addition to family medicine; correct?

A.     Correct.

Q.     And you were resistant to doing that; correct?

A.     Yes.

Q.     And why was it that you were resistant to doing that?

A.     Because just when she approached me with this, I was bringing on a new chairman of the department. My current chairman was stepping down. He had been there a very long time. And a new chairman was coming in the following month.

Q.     That's Dr. Savoy?

A.     Correct. I had mentioned to Lisa that after having many conversations with Dr. Savoy, I knew that she had a very large agenda that she was hoping to accomplish during her time at Temple, including starting a residency program in family medicine for which we didn't have one; work with the architects and the doctor in helping to design what would be this supposed residency program space in a new building, and so on. And new people have new ideas and some of them are great and some of them are grandiose, but she had many of them. And I asked Lisa to at

least wait to have a conversation with Dr. Savoy regarding this because she expected – she, Dr. Savoy, expected me to be her full-time administrator, not to be a 50/50 administrator with dermatology and 50% with family medicine. I felt that it was a courtesy that had to happen. I never heard anything back after that.

(Jt. Appx. 67, Pl. Dep. 48:11-50:11.)

**Response:** **Undisputed.**

135. Fino did not tell Plaintiff during that February 2018 discussion that she was sure, or it was likely, that family medicine and dermatology would be combined from an administrator perspective, as "[t]hings change" and "were changing..all the time." (Jt. Appx. 801, Fino Dep. 162:4-16.)

**Response:** **Undisputed. By way of further response, Ms. Fino testified that she believed the inference was clear that family medicine and dermatology would be combined from under one administrator from her statement that it would behoove Plaintiff to take on the administrator role for Dermatology. (Jt. Appx. 801, Fino depo. p. 162:11-16) Ms. Fino further testified that it was clear that administrators were taking on additional responsibility by picking up more departments:**

> **Q.** **Did you, other than your use of the word "behoove," did you give her any indication that you were sure or that this was a strong possibility that family medicine and dermatology would be combined at some point in the future?**
>
> **A.** **I would say by inference since you could see all around us that administrators were picking up more departments, you could infer from the discussion that that's what was going to happen.**

**(Jt. Appx. 801, Fino depo. p. 162-163)**

136. Fino did not say anything to Plaintiff in the February 2018 meeting that indicate that Fino knew as of that time that it was a strong possibility or that she was almost certain that family medicine and dermatology would be combined at some point in the future. (Jt. Appx. 801, Fino Dep. 163:9-22.)

**Response:** **Undisputed. By way of further response, see Temple's response to SOAF 135 above.**

137.   Fino never told Plaintiff that they were trying to consolidate departments under senior administrators to save money. (Jt. Appx. 68, Pl. Dep. 50:21-51:2.)

**Response:**   **Undisputed that Plaintiff testified consistent with SOAF 137. By way of further response, Temple incorporates its response to No. 135 above, citing Ms. Fino's testimony that "... you could see all around us that administrators were picking up more departments, you could infer from the discussion that that's what was going to happen." (Jt. Appx. 801, Fino depo. p. 163)**

138.   As of that time that, according to Fino, Plaintiff said that she was not interested in picking up Dermatology, Fino said that she would just think about which departments could be combined other than Family Medicine and Dermatology. (Jt. Appx. 802, Fino Dep. 166:14-168:16.)

**Response:**   **Undisputed.**

139.   In that February 2018 discussion with Plaintiff, Fino did not say to her something to the effect of, we have decided to combine family medicine and dermatology from the administrator perspective. (Jt. Appx. 803, Fino Dep. 171:3-9.)

**Response:**   **Disputed, but the dispute is not material to Temple's motion. By way of further response, Ms. Fino's response to the question whether she did not say to Plaintiff something to the effect of, we have decided to combine family medicine and dermatology from the administrator perspective was, "I did not use those exact words, that is correct." (Jt. Appx. 803, Fino depo. p. 171)**

140.   In that February 2018 discussion with Plaintiff, Fino did not say to her something like, I believe it is a very strong possibility or a very strong likelihood that these departments will be combined from an administrator perspective. (Jt. Appx. 803, Fino Dep. 171:10-21.)

**Response:**   **Disputed, but the dispute is not material to Temple's motion. By way of further response, Ms. Fino's response to the question whether she had said something to Plaintiff like, I believe it is a very strong possibility or a very strong likelihood that these departments will be combined from an administrator perspective was, "To my recollection, no, I did not use those words." (Jt. Appx. 803, Fino depo. p. 171)**

141.    According to Fino, the only thing that she said in that February 2018 discussion to indicate to Plaintiff that it would be a good idea for her to pick up administrator responsibilities for Dermatology was to use the word "behoove". (Fino Dep. Jt. Appx. 803, 171:23-172:4.)

**Response:**         **Disputed, but the dispute is not material to Temple's motion. By way of further response, Ms. Fino reiterated her comment that it was clear that administrators were taking on additional responsibility. She said:**

**A.      I will add to that, as all the administrators, as all the administrators were being asked to pick up additional stuff. Many administrators were picking up additional things.**

**(Jt. Appx. 803, Fino depo. p. 172)**

142.    At some point after Fino's February 2018 discussion with Plaintiff, she talked to the new Chair of Family Medicine, Dr. Savoy, as to whether she would be okay with sharing an administrator between Family Medicine and Dermatology. (Jt. Appx. 807, Fino Dep. 187:12-188:15.)

**Response:**         **Undisputed. By way of further response, Ms. Fino testified that she and Mr. Kupp spoke with Dr. Savoy. (Jt. Appx. 807, Fino depo. 187-188)**

143.    Generally speaking, it was the practice of administration to get the chairs of the different departments on board with administrator changes or decisions. (Jt. Appx. 806, Fino Dep. 182:19-183:1.)

**Response:**         **Undisputed.**

144.    As to when the decision was made to combine the Senior Administrator role for Family Medicine and Dermatology, Fino testified as follows:

Q.      Okay. And is it your testimony as you sit here today that you cannot tell me when between February of 2018 and September of 2020 the decision was made to combine the senior administrator role for family medicine and dermatology?

A.      Yes, that is correct.

(Jt. Appx. 812, Fino Dep. 205:8-14.)

**Response:**         **Undisputed that Ms. Fino testified that she could not pinpoint a date.**

38

145.    Fino was able only to affirm that the decision to combine the Senior Administrator role for Family Medicine and Dermatology at some point between February 2018 and September 1, 2020 when Amala Davis was placed into that role. (Jt. Appx. 811, Fino Dep. 204:24-205:7.)

**Response:      Undisputed that Ms. Fino testified as indicated.**

146.    Fino relayed to Zimmaro her February 2018 discussion with Plaintiff that it would "behoove" her to pick up dermatology and Plaintiff's response that she was not interested. (Jt. Appx. 812, Fino Dep. 205:24-206:19.)

**Response:      Undisputed.**

147.    Fino does not recall whether she told Kupp about her February 2018 discussion with Plaintiff that it would "behoove" her to pick up Dermatology and Plaintiff's response that she was not interested. (Jt. Appx. 812, Fino Dep. 206:20-207:1.)

**Response:      Undisputed. By way of further response, Mr. Kupp recalled that Ms. Fino informed her about the conversation within a day of when it occurred. (Jt. Appx. 136, Kupp depo. p. 216)**

148.    Fino testified that in February 2018, she was authorized to offer Plaintiff a position of Senior Administrator for Family Medicine and Dermatology. (Jt. Appx. 814, Fino Dep. 215:10-15.)

**Response:      Undisputed that SOAF 148 is consistent with Ms. Fino's testimony, but the citation to the Joint Appendix is incorrect.**

149.    According to Fino, either Kupp or Zimmaro told her that she could offer Plaintiff the position of Senior Administrator for Family Medicine and Dermatology. (Jt. Appx. 844, Fino Dep. 333:17-22.)

**Response:      Undisputed.**

150.    Fino subsequently testified that she offered Plaintiff a position of Senior Administrator for Family Medicine and Dermatology. (Jt. Appx. 847, Fino Dep. 347:10-12.)

**Response:      Undisputed; however see discussion at SOAF 151.**

151.    Fino confirmed that the position that she offered Plaintiff, that of Senior Administrator for Family Medicine and Dermatology, was a newly created position. (Jt. Appx. 847, Fino Dep. 347:14-18.)

**Response:**        **Undisputed in part, and disputed in part, but the dispute is not material to Temple's motion. It is undisputed that in the limited portion of the testimony cited in SOAF 151, Ms. Fino said what is attributed to her. The reference to a "*newly created position*," however, is disputed. By way of further response, as discussed in response to SOAF 115 et seq., Ms. Fino testified extensively – for approximately 60 pages in the transcript – about the discussion she had with Plaintiff in February 2018 in which she offered Plaintiff the opportunity to take on the administrator role for Dermatology in addition to Family Medicine. Throughout that testimony, Plaintiff tried to explain the informal process with Mr. Kupp and Mr. Zimmaro that led to the offer, as well as what occurred in the conversation with Plaintiff. Plaintiff's attempt in that portion of Ms. Fino's deposition to insert an artificial construct around whether a "*newly created position of Senior Administrator for Family Medicine and Dermatology*" had been *decided on, created, or existed*, and the exact time frame, muddied the issue. On cross-examination by Temple's counsel, which lasted approximately five minutes, a few short questions cleared up the confusion. Ms. Fino testified that (a) she was authorized to have the discussion and make the offer to Plaintiff, (b) if Plaintiff had said yes, the role of administrator for Dermatology would have been hers, and (c) a formal job description, or an existing job of that exact type, was not necessary. (Jt. Appx. 835-836, Fino depo. p. 299-303) In an effort to undo the straightforward clarity of that testimony, Plaintiff then spent another 60-plus pages of the transcript (Jt. Appx. 836-852, Fino depo. p. 303-366) again attempting to get Plaintiff to say things in a way that did not make sense to her. The isolated statement cited in SOAF 151 is part of that testimony.**

152.    Fino confirmed that an offer letter does not exist for the position that she offered Plaintiff, the newly created position of Senior Administrator for Family Medicine and Dermatology. (Jt. Appx. 847, Fino Dep. 347:20-24.)

**Response:**        **Undisputed. By way of further response, see discussion at SOAF 151.**

153.    Fino subsequently testified that she offered Plaintiff the position of Senior Administrator for Family Medicine and Dermatology, Plaintiff said that she was not interested, and then Fino said that it would "behoove" her to pick up Dermatology. (Jt. Appx. 850, Fino Dep. 360:24-261:13.)

**Response:**        **Undisputed. By way of further response, see discussion at SOAF 151.**

154.    According to Kupp, as of February 2018, a final decision had not been made about Plaintiff picking up another department. (Jt. Appx. 132, Kupp Dep. 197:12-198:2.)

**Response:    Undisputed.**

155.    According to Kupp, based on discussions that he had with Fino and Zimmaro, Fino was going to talk to Plaintiff to gauge her interest in picking up Dermatology. (Jt. Appx. 133, Kupp Dep. 201:14-202:5.)

**Response:    Undisputed.**

156.    Kupp testified that they did not just assign Dermatology to Plaintiff because, generally, assigning different work to an employee might result in that person not being very happy and maybe not wanting to stay employed. (Jt. Appx. 133, Kupp Dep. 202:6-16.)

**Response:    Undisputed. By way of further response, Mr. Kupp went on to say that although they could have simply assigned Plaintiff the added responsibilities, they try to get "buy in" first. (Jt. Appx. 133, Kupp depo. p. 204)**

157.    The instruction to Fino was to talk to Plaintiff and see if she will take on Dermatology. (Jt. Appx. 135, Kupp Dep. 209:7-14.)

**Response:    Undisputed.**

158.    According to Kupp, the discussion that Fino had with Plaintiff about Dermatology was just about whether Plaintiff would be willing to take on the Dermatology Department. (Jt. Appx. 135, Kupp Dep. 212:13-20.)

**Response:    Undisputed.**

159.    According to Kupp, taking on Dermatology as well as Family Medicine was not presented to Plaintiff as an offer for a new combined position of Dermatology and Family Medicine. (Jt. Appx. 135, Kupp Dep. 209:15-210:1.)

**Response:    Undisputed, however, Mr. Kupp immediately clarified his answer:**

**A.    Well, let me just clarify.**

**Q.    Sure.**

A.      So it really was we were asking Betsy to take on dermatology in a shared service model to be the administrator, the multi-department administrator for both departments.

Q.      Right. But you weren't making her an offer, you were just asking her if she was interested in taking it on?

MR. SACKS: Objection.

THE WITNESS: I consider that an offer.

**(Jt. Appx. 135, Kupp depo. p. 210)**

160.    Kupp then changed his testimony and said that he did consider that they made Plaintiff an offer for a new position of combined Administrator for Family Medicine and Dermatology. (Jt. Appx. 135, Kupp Dep. 210:9-211:14.)

**Response:**      **Undisputed. By way of further response, Mr. Kupp clarified his testimony as described at SOAF 159.**

161.    As of February 2018, there was no discussion about terminating Plaintiff, including if she did not want the newly combined position of Administrator for Family Medicine and Dermatology. (Jt. Appx. 135, Kupp Dep. 212:21-213:9.)

**Response:**      **Undisputed. By way of further response, the question posed to Mr. Kupp did not refer to "*the newly combined position of Administrator for Family Medicine and Dermatology*," but rather asked whether there was discussion at that time about terminating Plaintiff's employment if she didn't take "this position."**

162.    About twenty four (24) hours after Fino had the February 2018 discussion with Plaintiff about picking up Dermatology, Fino told Kupp that Plaintiff was not willing to take on Dermatology, and that she felt it was enough to have Family Medicine. (Jt. Appx. 136, Kupp Dep. 216:19-217:16; 218:18-219:1.)

**Response:**      **Undisputed.**

163.    As of the time that Fino discussed with Plaintiff picking up Dermatology, there had not been a determination of whether her doing so would warrant an increase in compensation. (Jt. Appx. 137, Kupp Dep. 218:9-12.)

**Response:**      **Undisputed.**

164.    Dr. Margot Savoy was employed at Defendant from March 2018 through June 30, 2021. She was hired as the Chair of Family and Community Medicine and retained that position throughout her employment. (Jt. Appx. 907, Savoy Dep. 6:24-7:15.)

**Response:**    **Undisputed.**

165.    In discussions with Dr. Savoy had with Kupp and Kaiser before she officially started in March 2018, they did not discuss with her anything about splitting the administrator duties that Plaintiff handled between Family Medicine and another department. (Jt. Appx. 909, Savoy Dep. 14:15:21.)

**Response:**    **Undisputed.**

166.    At the time that Dr. Savoy started in March 2018, her understanding was that Plaintiff, the administrator for Family Medicine at that time, would be handling administrator duties for only Family Medicine. (Jt. Appx. 909, Savoy Dep. 15:6-12.)

**Response:**    **Undisputed.**

167.    Dr. Savoy testified that, at some point in the first couple of weeks after Dr. Savoy started in March 2018, as part of her "listening tour", Plaintiff told her that she had been approached by Fino aand/or Kupp about taking on the administrator duties for Dermatology as well as Family Medicine. Dr. Savoy testified that Plaintiff had said that she was not comfortable doing so because she did not know how much work the residency program that Dr. Savoy wanted to start would be and she wanted Dr. Savoy's opinion. (Jt. Appx. 909, Savoy Dep. 15:24-17:17.)

**Response:**    **Undisputed.**

168.    Dr. Savoy testified that she responded to Plaintiff that she did not have enough information and was not prepared to make a decision about Plaintiff also handling Dermatology responsibilities, but that she would talk to Kupp and Fino and then follow up on it later. (Jt. Appx. 910, Savoy Dep. 17:18-18:2.)

**Response:**    **Undisputed.**

169.    Dr. Savoy testified that she discussed with Fino the issue of sharing administrators and raised some concerns about what that would mean about Plaintiff's time and commitment. (Jt. Appx. 910, Savoy Dep. 19:12-23.)

**Response:**    **Undisputed.**

43

170.     Dr. Savoy testified that Fino's response was "preliminary because she didn't really have details at the time that had been all the way worked out" and that Fino told her that she could follow up with Kupp who had been thinking about the issue of splitting Plaintiff's administrator duties between two departments. (Jt. Appx. 910, Savoy Dep. 19:24-20:6.)

**Response:**     **Undisputed that Dr. Savoy testified that Ms. Fino said she could talk with Mr. Kupp who had also been thinking about "this."  (Jt. Appx. 910, Savoy depo. p. 20)**

171.     Dr. Savoy testified that in her discussion with Fino she expressed that she needed more time and information to be able to make a decision about splitting Plaintiff's administrator duties between two departments was appropriate for Family Medicine. (Jt. Appx. 910, Savoy Dep. 20:7-19.)

**Response:**     **Undisputed.**

172.     Dr. Savoy testified that, after her discussion with Fino, she had a follow-up conversation with Kupp in which she raised the same concerns that she raised with Fino about Plaintiff's splitting her administrator duties between Family Medicine and Dermatology. (Jt. Appx. 910, Savoy Dep. 20:20-8.)

**Response:**     **Undisputed. By way of further response, Dr. Savoy described her discussion with Mr. Kupp in terms how "an administrator" would handle the dual role, rather than specifically referring to how Plaintiff would do so.**

173.     According to Dr. Savoy, after her discussions with Fino and Kupp, there was not a particular decision made as to Plaintiff splitting her administrator duties between Family Medicine and Dermatology. (Jt. Appx. 911, Savoy Dep. 22:20-23:9.)

**Response:**     **Undisputed that Dr. Savoy testified that following her discussion with Mr. Kupp there was no particular decision. By way of further response, Dr. Savoy did not refer to Plaintiff, specifically.**

174.     Dr. Savoy understood that she would be allowed to have input into the decision as to whether administrator duties would be split between Family Medicine and Dermatology. (Jt. Appx. 911, Savoy Dep. 24:4-15.)

**Response:**     **Undisputed. By way of further response, Dr. Savoy further testified that she understood that the decision about having a shared administrator did not rest with her. (Jt. Appx. 911, Savoy depo. p. 24)**

44

175.     According to Zimmaro, finances and how to meet budgets and cut expenses are always part of the discussion that is being had among the departments and the administrators and the practice groups. (Jt. Appx. Jt. Appx. 467, Zimmaro Dep. 28:15-29:5.)

**Response:        Undisputed.**

176.     According to Kupp, how to cut expenses and be more operationally efficient and increase the volume of patients have always been part of the discussions in the School of Medicine since he started in 2003. (Jt. Appx. 92, Kupp Dep. 37:2-12.)

**Response:        Undisputed.**

177.     According to Kupp, since he started at Defendant in 2003, they have always been looking for opportunities to make the operation more efficient. (Jt. Appx. 92, Kupp Dep. 38:20-39:13.)

**Response:        Undisputed. By way of further response, Mr. Kupp testified as follows:**

**A.        The main focus was really patient access and quality of care. But of course in order to be sustainable, you have to be able to have a balanced budget. And so as a result, we were constantly looking for opportunities to make our operation more efficient. With the lack of increases in reimbursement, that typically meant looking to consolidate and change work flows to make us more efficient and reduce costs.**

**(Jt. Appx. 92, Kupp depo. p. 39)**

178.     Any discussions that were being had in 2018 about how to cut costs, how to improve operational efficiency, how to increase the volume of patients being seen were consistent with prior discussions about those topics, which had been a focus from the time that Kupp started in 2003. (Jt. Appx. 92, Kupp Dep. 40:11-19.)

**Response:        Undisputed.**

179.     Throughout all of Plaintiff's employment with Defendant, year to year, they had financial issues. (Jt. Appx. 69, Pl. Dep. 54:8-13.)

**Response:        Undisputed.**

180.    Throughout Fino's employment with Defendant, there were ongoing discussions about financial constraints and how to work more efficiently, including having administrators handle more than one department. (Jt. Appx. 782, Fino Dep. 87:2-10.)

**Response:     Undisputed.**

181.    Throughout Plaintiff's employment, there was discussion about the need to increase volume and the need to increase the number of patients that doctors received. (Jt. Appx. 79, Pl. Dep. 94:10-95:2.)

**Response:     Undisputed.**

182.    According to Kupp, there was never a consideration of terminating Plaintiff prior to Spring 2018. (Jt. Appx. 93, Kupp Dep. 41:13-16.)

**Response:     Undisputed.**

183.    Zimmaro could not recall when Plaintiff's name entered into the discussion about layoffs prior to June 1, 2018. (Jt. Appx. 468, Zimmaro Dep. 29:6-13; 30:22-31:6.)

**Response:     Undisputed.**

184.    Zimmaro believed that Plaintiff's name entered the equation as a possible reduction between March 2018 and June 1, 2018. (Jt. Appx. 468, Zimmaro Dep. 32:1-5.)

**Response:     Undisputed.**

185.    When Zimmaro learned on June 1, 2018 from Kupp that the decision had been made to terminate Plaintiff's employment, he went through the steps that he takes in connection with a layoff, including: putting together a spreadsheet of employees with her same title, i.e., senior department administrators, including their dates of birth, years of service, potion title, Temple ID, and departments. Zimmaro also looked at the seniority to determine what the employees' severance would be, and he drafts a layoff notice. Then he sent the layoff notice and the spreadsheet to University Employee Relations, along with the size of the department in terms of revenue and number of physicians. (Jt. Appx. 470, Zimmaro Dep. 37:17-39:21.)

**Response:     Undisputed.**

186.    Zimmaro testified that he reviewed the spreadsheet that he sent to Employee Relations to see if any red flags jumped out at him in terms of protected characteristics like age. (Jt. Appx. 470, Zimmaro Dep. 40:20-41:2.)

**Response:     Undisputed.**

187.    There was never a directive to any of the departments that a position had to be eliminated. (Jt. Appx. 473, Zimmaro Dep. 52:13-16.)

**Response:     Undisputed.**

188.    There was never a directive to any of the departments that any personnel had to be terminated. (Jt. Appx. 473, Zimmaro Dep. 52:19-21.)

**Response:     Undisputed.**

189.    Prior to June 1, 2018, no one explained to Zimmaro the decision-making process resulting in the decision to terminate Plaintiff's employment. (Jt. Appx. Zimmaro Dep. 53:22-54:19.)

**Response:     Undisputed that Mr. Zimmaro testified that before June 1, 2018, no one explained the decision making process regarding Plaintiff's termination. By way of further response, Mr. Zimmaro also testified that prior to that, there were "multiple discussions about different scenarios that included Betsy as a possibility, along with many other departments and many other people." (Jt. Appx. 465, Zimmaro depo. p. 18-19)**

190.    Kupp did not tell Zimmaro about the decision-making process or how the decision was made to terminate Plaintiff's employment. (Jt. Appx. 474, Zimmaro Dep. 55:2-6.)

**Response:     Undisputed. By way of further response, Mr. Zimmaro testified that "On June 1st I was informed this is the only way they can meet their budget and unfortunately they are going to have to lay her off." (Jt. Appx. 474, Zimmaro depo. p. 54)**

191.    As Zimmaro said, Kupp was "my boss" and "he doesn't need to tell me." (Jt. Appx. 474, Zimmaro Dep. 55:8-10.)

**Response:     Undisputed.**

192.    Zimmaro testified that the reason that Kupp did not need to tell him about the decision-making process or how the decision was made to terminate Plaintiff's employment was because he did not have authority over Kupp and finances was not Zimmaro's area. (Jt. Appx. 474, Zimmaro Dep. 55:11-15.)

**Response:**    **Undisputed.**

193.    Zimmaro testified as follows:

Q.    All right, so prior to June 7th, 2018, when Miss Wolf is notified of her termination, has anyone from Temple explained to you the decision-making process, how they made the decision to lay her off?

A.    No. Not other than what Mr. Kupp told me.

Q.    Which was generally due to budgetary and financial restraints or financial restraints and operational efficiencies?

A.    That's correct.

Q.    All right. Nothing more than that –

A.    Nope.

Q.    --at any time prior to June 7th; correct?

A.    Nope. Nope.

Q.    That is correct; right?

A.    That is correct.

(Jt. Appx. 474, Zimmaro Dep. 55:17-56:9.)

**Response:**    **Undisputed.**

194.    Zimmaro testified that, prior to June 7th, 2018, he did not see any documentation regarding the termination decision, or laying out the reasons as to why the decision was made to terminate Plaintiff or anything about the rationale. Jt. Appx. 474, Zimmaro Dep. 56:11-18.

**Response:**    **Undisputed.**

195.    Zimmaro testified as follows:

Q.    Have you ever seen any documentation up through today that lays out the rationale or the reasons why the decision was made to terminate Betsy Wolf.

A.    No.

(Jt. Appx. 474, Zimmaro Dep. 56:20-24.)

**Response:    Undisputed.**

196.    Zimmaro denied that Plaintiff was selected for termination based on her age. (Jt. Appx. 468, Zimmaro Dep. 32:20-33:2.)

**Response:    Undisputed.**

197.    Zimmaro testified as follows:

Q.    When you have the June 1st discussion with Kupp in which he tells you that the decision has been made to lay her off, at any point between June 1st and June 7th when she is notified, did you do anything to ascertain whether or not her complaints about Temple's failure to take appropriate action in connection with the swastika incident is a factor in the decision to terminate her employment?

A.    That was not even discussed or even thought of or brought up.

Q.    Okay. So is that no?

A.    That's no.

(Jt. Appx. 522, Zimmaro Dep. 248:24-249:12.)

**Response:    Undisputed.**

198.    Zimmaro was not knowledgeable about what the budgetary situation was that, according to what Kupp told him, resulted in the decision to terminate Plaintiff's employment, other than that, in connection with his reviewing the budget, Defendant apparently could not "cut enough" to sustain retaining Plaintiff. (Jt. Appx. 464, Zimmaro Dep. 14:15-23.)

**Response:    Undisputed. By way of further response, for clarity, in the referenced section of Mr. Zimmaro's testimony, he was referring to the Chair of the Family Medicine department, in collaboration with Mr. Kupp, not being able to "cut enough" to sustain retaining Plaintiff.**

199.    Kupp told Zimmaro that, after consultation with Dr. Savoy, the Chair of Family Medicine, the determination was made to terminate Plaintiff's employment. (Jt. Appx. 464, Zimmaro Dep. 16:9-14.)

**Response:        Undisputed.**


200.    Kupp told Zimmaro on June 1, 2018 that the decision had been made to terminate Plaintiff's employment. (Jt. Appx. 465, Zimmaro Dep. 18:22-19:7.)

**Response:        Undisputed. By way of further response, Mr. Zimmaro further testified that prior to that, there were "multiple discussions about different scenarios that included Betsy as a possibility, along with many other departments and many other people." (Jt. Appx. 465, Zimmaro depo. p. 18-19)**


201.    Zimmaro denied that Plaintiff's age was a factor in the decision to terminate her employment. (Jt. Appx. 523, Zimmaro Dep. 249:14-18.)

**Response:        Undisputed.**


202.    Zimmaro was unable to point to a single document to support his testimony that Plaintiff's age was not a factor in the decision to terminate her employment. (Jt. Appx. 523, Zimmaro Dep. 249:19-250:5.)

**Response:        Undisputed.**


203.    Zimmaro denied that Plaintiff's age was a factor in Defendant's decision not to hire her back or place her into any position after her termination in June 2018. (Jt. Appx. 523, Zimmaro Dep. 251:23-252:5.)

**Response:        Undisputed.**


204.    Zimmaro denied that the fact that Amala Davis was twenty five (25) years younger than Plaintiff was a factor in the decision to place her into the Senior Administrator position for Family Medicine and Dermatology. (Jt. Appx. 524, Zimmaro Dep. 253:2-9.)

**Response:        Undisputed.**

205.    Zimmaro and Kupp met with Plaintiff to notify her of her termination. (Jt. Appx. 510, Zimmaro Dep. 197:20-198:9.)

**Response:    Undisputed.**

206.    The termination was about five or ten minutes long. (Jt. Appx. 510, Zimmaro Dep. 199:17-19.)

**Response:    Undisputed.**

207.    In the termination meeting, Kupp said something to the effect of that "we have been going through a lot of budgetary and operational challenges and unfortunately we need to lay you off." (Jt. Appx. 510, Zimmaro Dep. 198:20-199:3.)

**Response:    Undisputed.**

208.    Kupp told Plaintiff in the termination meeting that she should contact Human Resources so that they would go through her entitlement to post-employment benefits. He also told her that he recognized how upsetting this was. (Jt. Appx. 510, Zimmaro Dep. 199:9-16.)

**Response:    Undisputed.**

209.    During the termination meeting, Plaintiff asked whether her termination was due to her age, as she was one of the oldest employees in the department and one of the oldest senior administrators in the School of Medicine. She was told only that Temple had talked to its lawyers who had approved the decision to terminate her employment, and that it was a budgetary issue. (Docket No. 1, Pl. Compl. at ¶ 44; Jt. Appx. 512, Zimmaro Dep. 208:20-209:4.)

**Response:    Disputed, but the dispute is not material to Temple's motion for summary judgment. In Temple's answer to the Complaint, it denied the allegations of ¶ 44; Mr. Zimmaro testified that he had no recollection of Plaintiff asking if the termination was due to her age, and likewise did not recall any comment regarding Temple's lawyers approving the termination.**

210.    Zimmaro did not deny that Plaintiff said something to that effect as alleged in Paragraph 44 of her Complaint, just that he did not specifically recall the same. (Jt. Appx. 512, Zimmaro Dep. 208:20-209:9.)

**Response:    Undisputed that Mr. Zimmaro testified that he did not recall the comments alleged in ¶ 44 of the Complaint.**

211.    Kupp did not deny Plaintiff's allegations in Paragraph 44 of her Complaint that during the termination meeting, Plaintiff asked whether her termination was due to her age, as she was one of the oldest employees in the department and one of the oldest senior administrators in the School of Medicine. She was told only that Temple had talked to its lawyers who had approved the decision to terminate her employment, and that it was a budgetary issue. (Docket No. 1, Pl. Compl. at ¶ 44; Jt. Appx. 151, Kupp Dep. 274:8-275:4.)

**Response:        Disputed as stated, but the dispute is not material to Temple's motion. By way of further response, Mr. Kupp testified that he did not recall the comments alleged in ¶ 44 of the Complaint. (Jt. Appx. 151, Kupp depo. p. 274-5)**

212.    Zimmaro did not say anything during the termination meeting. (Jt. Appx. 510, Zimmaro Dep. 199:4-5.)

**Response:        Undisputed.**

213.    Zimmaro confirmed that the termination decision was not based on performance. (Jt. Appx. 510, Zimmaro Dep. 200:12-23.)

**Response:        Undisputed.**

214.    Zimmaro testified that Plaintiff's position of Senior Administrator for Family Medicine was eliminated. (Jt. Appx. 511, Zimmaro Dep. 204:9-14.)

**Response:        Undisputed.**

215.    Zimmaro testified that Plaintiff's job responsibilities were not eliminated, they survived her termination and were picked up by Fino, and then, by Amala Davis. (Jt. Appx. 511, Zimmaro Dep. 204:15-24.)

**Response:        Undisputed.**

216.    The senior administrator responsibilities for Family Medicine still existed subsequent to Plaintiff's termination, i.e., they did not go away. (Jt. Appx. 482, Zimmaro Dep. 86:6-9.)

**Response:        Undisputed.**

217.    According to Zimmaro, a decision has not been made to use the shared administrator model for Family Medicine prior to Plaintiff's termination. (Jt. Appx. 482, Zimmaro Dep. 85:10-16.)

**Response:**     **Undisputed that Mr. Zimmaro testified as follows:**

**Q.**     **Sure. Prior to Betsy Wolf's termination, as far as you knew, there had not been a decision for family and community medicine to use the shared administrator model; correct?**

**A.**     **That's correct, there was no final decision.**

**(Jt. Appx. 482, Zimmaro depo. p. 85)**

218.    To Zimmaro's knowledge, neither Kupp nor Fino made any efforts to help Plaintiff find a job within Defendant after the decision had been made to terminate her employment. (Jt. Appx. 489, Zimmaro Dep. 113:9-13.)

**Response:**     **Undisputed.**

219.    Defendant, including Fino, never extended an offer to Defendant to take over administrative responsibilities for both Family Medicine and Dermatology. (Jt. Appx. 784, Fino Dep. 95:11-17.)

**Response:**     Disputed, but the dispute is not material to Temple's motion for summary judgment. (Temple assumes for purposes of response that in SOAF 219 Plaintiff meant to say "… never extended an offer to *Plaintiff* …")  By way of further response, Ms. Fino testified that in her view, she made an offer to Plaintiff, in the February 2018 conversation, to take on responsibility for the Dermatology department in addition to Family Medicine, and that Plaintiff declined. (Jt. Appx. 800, Fino depo. p. 159) Ms. Fino called Mr. Zimmaro to describe her conversation with Plaintiff shortly after it occurred, and Mr. Kupp recalled that Ms. Fino also called him to describe the conversation with Plaintiff, and she conveyed that Plaintiff had declined the offer for reasons related to handling two departments and two chairpersons. (Jt. Appx. 137, Kupp depo. p. 220) Mr. Kupp and Mr. Zimmaro each were aware of their prior conversation with Ms. Fino about Plaintiff taking on the administrator role for the Dermatology department. Mr. Kupp's understanding about the conversation between Ms. Fino and Plaintiff contributed to his later decision regarding Plaintiff's layoff.

220.    Defendant, including Fino, never offered Plaintiff a position that would have her handling administrative duties for both family medicine and dermatology prior to Plaintiff's termination. (Jt. Appx. 79, Pl. Dep. 95:18-23.)

**Response:**    **Disputed, but the dispute is not material to Temple's motion for summary judgment. By way of further response, Temple incorporates its response to SOAF 219.**

221.    Defendant never offered Plaintiff a position that would have her overseeing administrative responsibilities for multi-practice areas prior to Plaintiff's termination. (Jt. Appx. 79, Pl. Dep. 95:24-96:6.)

**Response:**    **Disputed, but the dispute is not material to Temple's motion for summary judgment. By way of further response, Temple incorporates its response to SOAF 219.**

222.    Aside from Plaintiff's discussion with Fino in around February 2018, Plaintiff was never asked by anyone at Defendant whether she would be willing to handle administrative responsibilities for multiple departments. (Jt. Appx. 79, Pl. Dep. 96:7-13.)

**Response:**    **Undisputed.**

223.    Plaintiff never indicated to anyone at Defendant at any time prior to her termination that she would not be willing to handle administrative responsibilities for multiple departments. (Jt. Appx. 79, Pl. Dep. 96:14-20.)

**Response:**    **Disputed, but the dispute is not material to Temple's motion for summary judgment. By way of further response, Temple incorporates its response to SOAF 219.**

224.    Plaintiff never told Fino that she was going to refuse to handle both Family Medicine and Dermatology if that is what Defendant wanted her to do. (Jt. Appx. 79, Pl. Dep. 96:21-97:6.)

**Response:**    **Undisputed in part, disputed in part, but the dispute is not material to Temple's motion for summary judgment. It is undisputed that Plaintiff testified as indicated in SOAF 224. By way of further response, Temple incorporates its response to SOAF 219.**

225.    No one at Defendant ever indicated to Plaintiff that if she was not willing to oversee or handle administrative responsibilities for both Dermatology and Family Medicine she would lose her employment with Defendant or anything along those lines. (Jt. Appx. 79, Pl. Dep. 97:7-14.)

**Response:**    **Undisputed.**

226.    If, at any point, Fino or anyone else at Defendant had said something to Plaintiff that they were combining positions, that she was going to need to take over Dermatology and Family Medicine together and handle both of those departments' administrative responsibilities or that she was going to lose her job, she would have taken the combined position. (Jt. Appx. 79, Pl. Dep. 97:15-24.)

**Response:**    **Undisputed in part, disputed in part, but the dispute is not material to Temple's motion for summary judgment. It is undisputed that Plaintiff testified as indicated in SOAF 226. By way of further response, Temple incorporates its response to SOAF 219.**

227.    According to Kupp, Fino and Zimmaro made the recommendation to terminate Plaintiff's employment and Kupp approved the recommendation. (Jt. Appx. 142, Kupp Dep. 238:21-24.)

**Response:**    **Undisputed.**

228.    According to Kupp, he did not have the right to terminate anyone, or lay anyone off. (Jt. Appx. 142, Kupp Dep. 239:11-12.)

**Response:**    **Undisputed. By way of further response, Mr. Kupp continued his testimony by saying "It is always reviewed by HR with the dean's agreement. So it is a subtle point with regard to who made the decision. There's a process." (Jt. Appx. 142, Kupp depo. p. 239)**

229.    Kupp approved Zimmaro and Fino's recommendation to terminate Plaintiff's employment, and then it was submitted to the Dean, Dr. Kaiser, and to University Human Resources to approve. (Jt. Appx. 142, Kupp Dep. 239:11-240:8.)

**Response:**    **Undisputed.**

230.    Prior to June 7, 2018 when Plaintiff was notified of her termination, Kupp never had a conversation with her about the combined Senior Administrator position for Family Medicine and Dermatology, including to say something along the lines of that if she did not accept the position she would be out of a job, or anything to that effect. (Jt. Appx. 148, Kupp Dep. 262:2-10.)

**Response:        Undisputed.**

231.    Kupp is not sure whether anyone had a conversation along those lines with Plaintiff, i.e., that if she did not accept the position she would be out of a job, or anything to that effect. (Jt. Appx. 148, Kupp Dep. 262:11-14.)

**Response:        Undisputed.**

232.    Kupp never directed anyone at Defendant to have a discussion with Plaintiff along the lines of that if she did not accept the position she would be out of a job, or anything to that effect. (Jt. Appx. 148, Kupp Dep. 262:15-21.)

**Response:        Undisputed. By way of further response, Mr. Kupp testified:**

**A.      No. And I probably wouldn't because she made very clear that she wasn't able to take on an additional department, so I'm not going to force somebody who's telling me that she can't do it.**

**(Jt. Appx. 148, Kupp depo. p. 262)**

233.    Kupp never discussed with Fino and Zimmaro that they should tell Plaintiff that they were definitely moving to a shared administrator position for Family Medicine and Dermatology. (Jt. Appx. 149, Kupp Dep. 266:16-167:1.)

**Response:        Undisputed. By way of further response, Mr. Kupp referred to the fact that Plaintiff was "well aware" of the movement to shared administrators. He testified:**

**Q.      To your knowledge, was she ever told at any point prior to June 7th, 2018, which is when she was notified, that the school was moving to a shared administrator position combining family medicine and dermatology?**

**A.      I don't recall what Lisa told her about family medicine and dermatology when she had an initial discussion with her. Betsy was well aware that we were moving toward a shared service model for the**

practice and that we are consolidating administrators. She was well aware of that.

Q.      You and Greg and Lisa in your description of your discussions about the offer to Betsy did not talk about telling Betsy we are moving to a shared administrator role for dermatology and family medicine; correct?

MR. SACKS: Objection to the form. Wow. Go ahead.

THE WITNESS: We offered her the position of dermatology and said she was not able to take it.

BY MS. GURMANKIN:

Q.      That wasn't my question.

A.      Then repeat your question.

MS. GURMANKIN: Do you mind, Terry. Thanks.

(The question was then read back by the reporter.)

THE WITNESS: And I believe my response was you'd have to check with Lisa to see what the conversation was that she had in February.

BY MS. GURMANKIN:

Q.      And my question was, you, Greg and Lisa never discussed that; correct?

A.      I'm sorry, never discussed what?

Q.      Telling Betsy that we are moving to a shared administrator position for family medicine and dermatology, your position is going to change to a new position, a combined position, you never discussed that with Greg and Lisa; correct?

A.      Correct.

(Jt. Appx. 149, Kupp depo. p. 265-267)


234.    When Defendant terminated Plaintiff's employment, they told her that she was being terminated for financial reasons. (Jt. Appx. 69, Pl. Dep. 54:3-54:7.)

Response:      Undisputed.

235.    According to Fino, she took over Plaintiff's Family Medicine administrator duties when Plaintiff was terminated. (Jt. Appx. 767, Fino Dep. 28:13-15.)

**Response:    Undisputed.**

236.    According to Fino, she handled Plaintiff's Family Medicine administrator responsibilities, as well as the administrator responsibilities for Dermatology, for about one year after Plaintiff's termination, through about mid-2019. (Jt. Appx. 767, Fino Dep. 29:5-11.)

**Response:    Undisputed. By way of further response, Ms. Fino referred to that as a "guestimate." (Jt. Appx. 768, Fino depo. p. 29)**

237.    According to Fino, in about mid-2019, Colleen McAllister took over the administrator responsibilities for Dermatology in about July 2018. (Jt. Appx. 768, Fino Dep. 31:17-32:5.)

**Response:    Temple cannot respond to SOAF 237 as phrased because it does not make sense. By way of further response, it is undisputed that Ms. Fino testified that Colleen McAllister took over administrator responsibilities for Dermatology at some point, but Ms. Fino was unclear on dates. (Jt. Appx. 768, Fino depo. p. 31-32)**

238.    Dr. Savoy was notified about the decision to terminate Plaintiff's employment in early June, very shortly before the date on which Plaintiff was notified, June 7, 2018. (Jt. Appx. 912, Savoy Dep. 25:17-26:2.)

**Response:    Undisputed.**

239.    Fino testified that she called Dr. Savoy right before Plaintiff was notified of her termination on June 7, 2018 to let her know that the decision had been made to terminate Plaintiff's employment and that they were going to notify Plaintiff on that same day. (Jt. Appx. 827, Fino Dep. 267:18-269:13.)

**Response:    Undisputed.**

240.   When Dr. Savoy was notified about the decision to terminate Plaintiff's employment in early June, she was also notified about the decision to, going forward, split the administrator position between Family Medicine and Dermatology. (Jt. Appx. 913, Savoy Dep. 29:18-30:1.)

**Response:      Undisputed.**

241.   Dr. Savoy was not given any information as to why the decision had been made to terminate Plaintiff's employment. (Jt. Appx. 913, Savoy Dep. 30:21-23.)

**Response:      Undisputed in part, disputed in part, but the dispute is not material to Temple's motion for summary judgment. By way of further response, in the cited testimony, Dr. Savoy said that in the conversation in which Ms. Fino informed her of Plaintiff's impending layoff, Ms. Fino did not tell her why the decision had been made, but that she "also did not ask specifically." Further, Dr. Savoy was aware from Plaintiff and from Ms. Fino and Mr. Kupp that Plaintiff had been offered the opportunity to cover both Family Medicine and Dermatology and had declined. (Jt. Appx. 913, Savoy depo. 31-32) Dr. Savoy was also aware, from her conversations with Mr. Kupp, about the Family Medicine department's budget gap and possible ways to close the gap, including layoffs. (Jt. Appx. 912, Savoy depo. p. 27)**

242.   Plaintiff's June 7, 2018 termination letter stated that, "due to department restructuring your position will be eliminated with Temple University effective the end of business on Friday, June 29, 2018." The letter further stated that the "decision is not based on performance". (Jt. Appx. 460.)

**Response:      Undisputed.**

243.   Plaintiff served Interrogatories on Defendant in which she asked Defendant to "[s]tate with specificity each and every legitimate, non-discriminatory reason as to why Plaintiff was terminated in June 2018, and the complete factual bases for the same. Defendant's Answers and Objections to Plaintiff's Betsy Wolf's Interrogatories, No. 1. In response to Plaintiff's Interrogatory No. 1, Defendant answered as follows:

For financial, budgetary and efficiency reasons, beginning in approximately 2013 and continuing through the present, Temple has been engaged in an ongoing process of consolidation and restructuring of positions within the Lewis Katz School of Medicine (LKSOM). As part of that ongoing process, Temple has been reducing the number of administrative personnel serving the Temple University Faculty Practices by moving to a "shared administrative" model, as well as reducing the number of administrative personnel serving other parts of LKSOM. Under the shared administrative model, one Administrator or Senior Administrator serves either a large practice department or two or more physician

practice departments. Betsy Wolf's layoff was part of that process. Ms. Wolf's layoff, along with that of Ilene Marker, Administrator in the Medical Education area, occurred shortly before the start of a new fiscal year as senior leadership implemented cost savings to reach their authorized budget. At the time, Ms. Wolf had the least seniority as a Senior Administrator running a physician practice department, and she oversaw the smallest department (by number of faculty and expenditure).

(Jt. Appx. 1247, No. 1.)

**Response:** **Undisputed.**

244.    Plaintiff served Interrogatories on Defendant in which she asked Defendant to "[i]dentify each individual who was involved in the decision to terminate Plaintiff's employment in June 2018, and describe each individual's role and input into that decision." Defendant's Answers and Objections to Plaintiff's Betsy Wolf's Interrogatories, No. 2. In response to Plaintiff's Interrogatory No. 2, Defendant answered as follows:

Subject to and without waiving such objections, the three individuals who were involved in the decision to lay off Betsy Wolf in June 2018 were Thomas Kupp, Lisa Fino and Greg Zimmaro. Mr. Kupp, who was then the Executive Director of the Temple University Physicians (TUP) and Senior Vice President for Finance and Administration for the Lewis Katz School of Medicine (LKSOM), was involved over an extended period of time in consulting with Ms. Fino, Mr. Zimmaro and others regarding consolidation and reassignment of positions to achieve savings and efficiencies, and was the lead decision maker of the three. Lisa Fino, then and now the Chief Operating Officer for the Temple University Physicians, worked with all of the TUP Senior Administrators, and she suggested assignments and reassignments in her discussions with Mr. Kupp and Mr. Zimmaro, the Assistant Dean for Human Resources & Administration at the LKSOM, to achieve savings and efficiencies, as well as to balance the workloads of the Senior Administrators.

With Mr. Kupp's approval, Ms. Fino discussed with Ms. Wolf in approximately February 2018 the transition to a shared administrative model, and offered Ms. Wolf the opportunity to take on a second TUP department, Dermatology, which Ms. Wolf declined. Ms. Fino told Mr. Zimmaro and Mr. Kupp about her conversation with Ms. Wolf, and both were surprised that Ms. Wolf had declined the opportunity to take on the Dermatology group. As the new fiscal year approached, with the consequent need to achieve cost savings to meet the authorized budget, Ms. Fino and Mr. Kupp, in consultation with Mr. Zimmaro, decided to lay off Ms. Wolf.

(Jt. Appx. 1247-1248, No. 2.)

**Response:** **Undisputed.**

245.   Greg Zimmaro verified Defendant's Answers to Plaintiff's Interrogatories – Set 1. (Jt. Appx. 1254.)

**Response:**   **Undisputed.**


246.   Fino testified that she was not involved in the decision to terminate Plaintiff's employment. (Jt. Appx. 815, Fino Dep. 219:2-5.)

**Response:**   **Undisputed.**


247.   According to Zimmaro's deposition testimony, Tom Kupp, Dr. Margot Savoy, and Lisa Fino made the decision to terminate Plaintiff's employment. (Jt. Appx. 463, Zimmaro Dep. 10:16-11:1.)

**Response:**   **Undisputed.**


248.   According to Zimmaro's deposition testimony, Kupp told Zimmaro that, "due to budgetary restraints and operational efficiencies", the decision was made to terminate Plaintiff. (Jt. Appx. 463, Zimmaro Dep. 11:12-12:3.)

**Response:**   **Undisputed.**


249.   The first time that Fino had any discussions with anyone at Defendant about the possibility of terminating Plaintiff was right before it happened, within just a few days of Plaintiff being notified of the same on June 7, 2018. (Jt. Appx. 813, Fino Dep. 209:11-210:11.)

**Response:**   **Undisputed that Ms. Fino testified as indicated.**


250.   Without about a week prior to Plaintiff being notified of her termination on June 7, 2018, Kupp told Fino that, based on the number of physicians, revenue, and expenses, and that Plaintiff was the least senior Senior Administrator, the decision was to lay her off. (Jt. Appx. 813, Fino Dep. 212:23-214:24.)

**Response:**   **Undisputed.**


251.   In that conversation between Fino and Kupp about a week before Plaintiff was notified of her termination on June 7, 2018, Kupp was relaying to Fino that the decision to terminate Plaintiff's employment had been made. (Jt. Appx. 815, Fino Dep. 218:14-219:1.)

**Response:**   **Undisputed.**

252.    The decision to terminate Plaintiff's employment was not made prior to June 1, 2018. (Jt. Appx. 465, Zimmaro Dep. 18:22-19:4.)

**Response:        Disputed as stated, but the dispute is not material to Temple's motion for summary judgment. By way of further response, Mr. Zimmaro's testimony was:**

**So to answer your question, there were prior conversations about the possible need to lay off Betsy Wolf, but I did not become aware of the actual decision to lay off Betsy Wolf until Mr. Kupp gave me the decision on June 1st that we had to go forward. Prior to that, there were multiple discussions about different scenarios that included Betsy as a possibility, along with many other departments and many other people.**

**(Jt. Appx. 465, Zimmaro depo. p. 18-19, including errata, Jt. Appx. 757)**

253.    Between June 1, 2018 and June 7, 2018 when Plaintiff was told of her termination, Zimmaro did not have any other conversations with Kupp about the decision to terminate Plaintiff's employment. (Jt. Appx. 465, Zimmaro Dep. 19:12-18.)

**Response:        Undisputed.**

254.    Between June 1, 2018, when Zimmaro learned of the decision to terminate Plaintiff's employment, and June 7, 2018, when Plaintiff was told of her termination, Zimmaro did not have any discussions with Fino about the decision to terminate Plaintiff's employment. (Jt. Appx. 465, Zimmaro Dep. 19:22-20:4.)

**Response:        Undisputed.**

255.    Between June 1, 2018, when Zimmaro learned of the decision to terminate Plaintiff's employment, and June 7, 2018, when Plaintiff was told of her termination, Zimmaro did not have any discussions with Dr. Savoy about the decision to terminate Plaintiff's employment. (Jt. Appx. 465, Zimmaro Dep. 20:5-9.)

**Response:        Undisputed.**

256.    Between June 1, 2018, when Zimmaro learned of the decision to terminate Plaintiff's employment, and June 7, 2018, when Plaintiff was told of her termination, Zimmaro did not ask anyone why the decision had been made to terminate Plaintiff specifically as opposed to someone else. (Jt. Appx. 465, Zimmaro Dep. 20:11-19.)

**Response:      Undisputed. By way of further response, Mr. Zimmaro testified that he did not ask anyone because "By then it was clear that the decision was made based on budgetary reasons, that they needed to -- that we needed to lay off Betsy Wolf." (Jt. Appx. 465, Zimmaro depo. p. 20)**

257.    Zimmaro testified that, in discussions prior to June 1, 2018 when Kupp informed him of the decision to terminate Plaintiff's employment, discussions were had about all of the administrators by the following criteria: years of experience as a senior administrator; budget situation of the department/practice area, meaning the budget targets for each particular practice area and what they had to do to meet their budgets. (Jt. Appx. 466, Zimmaro Dep. 23:1-26:17.)

**Response:      Undisputed. By way of further response, the testimony cited in SOAF 257 immediately followed Mr. Zimmaro's testimony that such things would have been considered by Senior Leadership:**

**A.      Well, it would have been -- it would have been considered at senior leadership who are all our administrators, how many years' experience they have, where is the budget targets they have to get to, the whole combination of things would be looked at.**

**(Jt. Appx. 466, Zimmaro depo. p. 22)**

258.    Fino never saw any document during her employment at Defendant, from 2009 through the date of her deposition, staying that layoffs should be based on any particular criteria, including, but not limited to, seniority in the position; and, number of physicians, revenue and expenses of the particular department. (Jt. Appx. 814, Fino Dep. 216:21-217:7.)

**Response:      Undisputed.**

259.    Zimmaro testified that other administrators were pulled into the discussion prior to June 1, 2018 because he was concerned and wanted to make sure that Plaintiff's age was not a factor in her selection. (Jt. Appx. 467, Zimmaro Dep. 26:2-9.)

**Response:      Undisputed in part, disputed in part, but the dispute is not material to Temple's motion for summary judgment. By way of further response, Mr. Zimmaro did not say "prior to June 1, 2018." (Jt. Appx. 467, Zimmaro depo. p. 26)**

260.    Fino testified that she does not make layoff decisions and she does not approve layoffs. (Jt. Appx. 815, Fino Dep. 217:19-22.)

**Response:**    **Undisputed.**


261.    After Plaintiff was terminated, Fino never had discussions with anyone at Defendant about bringing Plaintiff back into an open position. (Jt. Appx. 823, Fino Dep. 249:24-250:4.)

**Response:**    **Undisputed.**


262.    After Plaintiff was terminated, Kupp never talked to Fino about the possibility of rehiring Plaintiff in any capacity. (Jt. Appx. 826, Fino Dep. 263:7-12.)

**Response:**    **Undisputed.**


263.    Fino never reached out to Plaintiff after Plaintiff was notified of her termination on June 7, 2018. (Jt. Appx. 826, Fino Dep. 264:11-13.)

**Response:**    **Undisputed.**


264.    Kupp did not ask anyone at Defendant to reach out to Plaintiff to see if she would be interested in returning to Defendant in the role of Senior Administrator for Family Medicine and Dermatology before Davis was promoted into that role. (Jt. Appx. 152, Kupp Dep. 280:6-10.)

**Response:**    **Undisputed. By way of further response, Mr. Kupp stated that he did not do so because Plaintiff "had left that role. She said she couldn't do more. And this was a stepping stone for Amala to take on more departments, which she ultimately did." (Jt. Appx. 152, Kupp depo. p. 280)**


265.    After Plaintiff's termination in June 2018, Zimmaro advised Kupp that Plaintiff had applied for at least one position at Defendant. Jt. Appx. 152, Kupp. Dep. 280:24-281:10.

**Response:**    **Undisputed.**


266.    Kupp denied that Plaintiff's age played a role in the decision to terminate her employment. (Jt. Appx. 155, Kupp Dep. 291:13-15.)

**Response:**    **Undisputed.**

267.    Kupp denied that Plaintiff's complaints about Defendant's inadequate handling of the swastika incident played a role in the decision to terminate her employment. (Jt. Appx. 155, Kupp Dep. 291:16-20.)

**Response:**    **Undisputed.**

268.    Kupp denied that Plaintiff's age played a role in the decision not to hire her into open positions after her termination. (Jt. Appx. 155, Kupp Dep. 291:21-24.)

**Response:**    **Undisputed.**

269.    Kupp denied that Plaintiff's complaints about Defendant's handling of the swastika incident played a role in the decision not to hire her into any open position. (Jt. Appx. 155, Kupp Dep. 292:1-5.)

**Response:**    **Undisputed.**

270.    After Plaintiff's termination, Kupp became aware that Plaintiff had filed complaints in connection with her termination. Kupp denied that those complaints played a role in the decision not to hire her into any open position. (Jt. Appx. 155, Kupp Dep. 292:6-17.)

**Response:**    **Undisputed.**

271.    Davis was born in December 1975. (Jt. Appx. 1187, Davis Dep. 6:16-17.)

**Response:**    **Undisputed.**

272.    Davis started at Defendant in 1998. From then through the end of 2003, her responsibilities consisted solely of analyzing inpatient medical records to look for certain key clinical findings, like diagnoses and past medical histories and then to fill out an abstract form, which would then be submitted into a database. (Jt. Appx. 1188, Davis Dep. 9:5-10:3.)

**Response:**    **Undisputed.**

273.    From 1998 through the end of 2003, neither Davis nor her position were associated with the School of Medicine or Defendant Temple University, but, rather the hospital. (Jt. Appx. 1187, Davis Dep. 8:2-17.)

**Response:**    **Undisputed.**

274.    At the end of 2003, Davis became a management fellow with Temple University Health System. (Jt. Appx. 1188, Davis Dep. 10:4-7.) That position was a "rotational assignment" for employees in the hospital that were finishing their graduate degrees and looking to be able to have future management positions. The position consisted of rotating through different areas to learn and to be able to work on real projects. (Jt. Appx. 1188, Davis Dep. 11:7-20.)

**Response:**    **Undisputed.**

275.    As a management fellow, Davis' work through her rotations consisted of approximately three (3) months in each of the following areas: the supply chain department in which she met with vendors, looked at pricing, worked with the leaders of the department and hospital administrators to be able to standardize operating room equipment to be able to lower costs, implementing and training people on an implant database; working with the associate hospital director in operations, working on various projects in terms of monitoring budgets, variance analysis reporting, dashboard reporting, Environment of Care Committee, certain regulatory projects; a finance rotation looking at financial statements and financial databases to become acclimated to the financial systems within the hospital; and, working with Temple University physicians, primarily in the department of cardiology to look at standardizing processes and procedures. (Jt. Appx. 1189, Davis Dep. 13:8-15:15.)

**Response:**    **Undisputed.**

276.    Davis agreed that the management fellowship could be classified as a "higher end internship program". (Jt. Appx. 1189, Davis Dep. 15:16-19.)

**Response:**    **Undisputed.**

277.    Davis agreed that the management fellowship was, in summary, a project-oriented role, i.e., assisting members of different departments with different projects. (Jt. Appx. 1189, Davis Dep. 15:20-16:2.)

**Response:**    **Undisputed.**

278.    After Davis' management fellowship, she had a Business Liaison position at Temple's Children's Medicine Center, from 2005 through the end of 2006. (Jt. Appx. 1189, Davis Dep. 16:15-23.)

**Response:**    **Undisputed.**

279.    In her Business Liaison role, Davis worked in the Urology and Dentistry Departments, working with the physicians to ensure that the departments ran efficiently; having responsibility for certain regulatory functions; acting as the marketing liaison; preparing pro formas for new business opportunities in connection with opening a young adult unit; being responsible for opening up satellite clinics (i.e., outfitting the space); creating financial dashboards for the professional service departments in terms of monthly variance reporting. (Jt. Appx. 1190, Davis Dep. 18:24-20:15.)

**Response:      Undisputed.**

280.    In around January 2007, Davis became administrator for the Radiology Department for Temple University Physicians. (Jt. Appx. 1192, Davis Dep. 27:7-12.)

**Response:      Undisputed.**

281.    Davis held the Administrator position for Radiology from 2007 through 2020. During that entire time, she reported to Administrative Director for Radiology, i.e., the highest level administrative employee for the Radiology practice area. (Jt. Appx. 1192, Davis Dep. 28:15-29:16.)

**Response:      Undisputed.**

282.    As of September 1, 2020, Davis became Senior Administrator for Family Medicine and Dermatology. (Jt. Appx. 1187, Davis Dep. 6:22-7:2; 37:8-16.)

**Response:      Undisputed.**

283.    Davis' Senior Administrator position came about as a result of discussions that she started having with Fino around Fall 2019. (Jt. Appx. 1194, Davis Dep. 38:9-39:7.)

**Response:      Undisputed.**

284.    In those discussions, Fino told Davis that they were potentially looking for an administrator for Family Medicine and Dermatology. (Jt. Appx. 1199, Davis Dep. 54:12-21.)

**Response:      Disputed as stated, but the dispute is not material to Temple's motion for summary judgment. By way of further answer, Ms. Davis retracted the phrase "looking for" an administrator, and said that Ms. Fino said it could potentially be an area, but it would be both Family Medicine and Dermatology together. (Jt. Appx. 1199, Davis depo. p. 54)**

285.    In around early summer 2020, Fino told Davis that she had been managing Family Medicine and Dermatology and she did not want to do so any longer such that the position was available. (Jt. Appx. 1200, Davis Dep. 58:12-59:11.)

**Response:      Undisputed.**

286.    Davis was offered, and accepted, the promotion to the Senior Administrator position for Family Medicine and Dermatology without applying for it. (Jt. Appx. 1200, Davis Dep. 59:12-19.)

**Response:      Undisputed.**

287.    Davis got a salary increase of approximately $18,000 in connection with her promotion to Senior Administrator for Family Medicine and Dermatology. (Jt. Appx. 1200, Davis Dep. 60:14-61:3.)

**Response:      Undisputed.**

288.    According to Kupp, Fino and Zimmaro made the recommendation to place Davis into the position of Senior Administrator for Family Medicine and Dermatology, and Kupp approved the recommendation. (Jt. Appx. 151, Kupp Dep. 276:4-9.)

**Response:      Undisputed.**

289.    According to Fino, Kupp and Zimmaro made the decision to promote Davis into the position of Senior Administrator for Family Medicine and Dermatology. (Jt. Appx. 823, Fino Dep. 250:9-19.)

**Response:      Undisputed.**

290.    According to Zimmaro, the Chairs of Family Medicine and Dermatology, in concert with Kupp, made the decision to put Davis into the position of Senior Administrator for Family Medicine and Dermatology. (Jt. Appx. 492, Zimmaro Dep. 126:3-127:3.)

**Response:      Undisputed.**

291.    Kupp met Davis before approving the recommendation to place her into the role of Senior Administrator for Family Medicine and Dermatology. (Jt. Appx. 151, Kupp Dep. 276:23-277:1.)

**Response:**    **Undisputed.**

292.    Kupp knew that Davis had small children, but testified that he was not sure how old she was and that she could have been twenty (20) or fifty (50). (Jt. Appx. 152, Kupp Dep. 277:2-278:3.)

**Response:**    **Disputed as stated, but the dispute is not material to Temple's motion for summary judgment. By way of further answer, Mr. Kupp responded to a series of questions asking about his perception of Ms. Davis's age, and in response he said that he had focused on her capabilities, not her age, and that he did not know her age but that she was "probably not 20" and was certainly closer to 50 than 25 but that he did not know her exact age.**

293.    Kupp knew that Davis was younger than Plaintiff. (Jt. Appx. 152, Kupp Dep. 279:3-7.)

**Response:**    **Undisputed.**

294.    During discussions that Davis had with Fino about the Senior Administrator position for Family Medicine and Dermatology, Fino explained that the position was open and had not been filled because of budgetary reasons and the fact that the practice plan was going to move under the hospital and Defendant did not want to hire someone from outside Temple and then have to lay them off; as such, due to restructuring and the financial climate of the institution, they decided not to externally hire anyone. (Jt. Appx. 1201, Davis Dep. 63:21-64:14.)

**Response:**    **Undisputed.**

295.    Since Davis became Senior Administrator for Family Medicine and Dermatology, she has reported directly to Fino. Fino reported to Tom Kupp. (Jt. Appx. 1203, Davis Dep. 70:4-18.)

**Response:**    **Undisputed.**

296.    In November 2020, some of Davis' responsibilities for Dermatology were decreased. She was no longer responsible for the Dermatology staff at all because they became part of a hospital-based billing department or the clinic, or the staff that support the clinic. She still supported the physicians. (Jt. Appx. 1203, Davis Dep. 72:13-73:7.)

**Response:**     **Undisputed.**

297. Davis' salary was $15,000 more than Plaintiff's at the time of Plaintiff's termination. (Jt. Appx. 1609-1610).

**Response:**     **Undisputed.**

298. In discussions about promoting Davis into the position of Senior Administrator for Family Medicine and Dermatology, Fino never raised the issue of possibly offering Plaintiff into that position. (Jt. Appx. 826, Fino Dep. 263:13-18.)

**Response:**     **Undisputed.**

299. Dr. William Dubin became Chair of the Psychiatrist Department at Defendant on an interim basis in July 2020 and then permanently in 2011. (Jt. Appx. 1226, Dubin Dep. 7:18-24.)

**Response:**     **Disputed but the dispute is not material to Temple's motion for summary judgment. By way of further answer, Dr. Dubin became chairperson on an interim basis in approximately July 2010, not 2020. (Jt. Appx. 1226, Dubin depo. p. 7)**

300. Colleen McAllister became Senior Administrator for Psychiatry when Fino approached him one day and said that she had someone in Pathology who was outstanding and that Dubin should interview her for the administrator role in Psychiatry. (Jt. Appx. 1229, Dubin Dep. 17:22-18:10.)

**Response:**     **Undisputed.**

301. Dubin agreed to interview McAllister for the administrator role in Psychiatry and that was how she was placed into that role. (Jt. Appx. 1229, Dubin Dep. 18:9-15.)

**Response:**     **Undisputed.**

302. Fino did not mention any other names to Dubin as possibilities for the Senior Administrator role for Psychiatry other than McAllister. (Jt. Appx. 1229, Dubin Dep. 19:4-6.)

**Response:**     **Undisputed.**

303.    Plaintiff had a background in psychiatry. (Jt. Appx. 72, Pl. Dep. 67:20-68:3.)

**Response:    Undisputed that in Plaintiff's view, she had a "background in psychiatry."**

304.    Dubin did not discuss any candidates for the position of Senior Administrator for Psychiatry. (Jt. Appx. 1229, Dubin Dep. 19:7-15.)

**Response:    Undisputed.**

305.    Dubin had no idea whether the position of Senior Administrator for Psychiatry was posted. (Jt. Appx. 1230, Dubin Dep. 21:8-14.)

**Response:    Undisputed.**

306.    No one at Defendant talked to Dubin about what he was looking for in connection with filling the position of Senior Administrator for Psychiatry. (Jt. Appx. 1230, Dubin Dep. 21:19-23.)

**Response:    Undisputed.**

307.    No one at Defendant, including Fino or Kupp, ever mentioned Plaintiff to Dubin as a possibility for the position of Senior Administrator for Psychiatry. (Jt. Appx. 1230, Dubin Dep. 24:4-8.)

**Response:    Undisputed.**

308.    Dubin testified that he never made a decision to cancel a job posting for the position for Senior Administrator for Psychiatry. (Jt. Appx. 1231, Dubin Dep. 25:12-19.)

**Response:    Undisputed.**

309.    Plaintiff served Interrogatories on Defendant in which she asked Defendant to "[i]dentify each individual who was involved in the hiring decisions regarding the Senior Administrator positions that Defendnat posted in or about December 2018, including the decisions not to select Plaintiff for those positions." Defendant responded that, "The Chair of the Psychiatry Department, Dr. William Dubin, in consultation with Lisa Fino and Thomas Kupp, made the decision to cancel the job posting and hire from within." Dep. Ex. P-12, No. 7.

**Response:    Undisputed.**

310.    Defendant's March 2, 2020 Position Statement to the PHRC responding to Plaintiff's Complaint of discrimination and retaliation included that, "Temple did not discriminate or retaliate against Complainant on the basis of her age of her complaints of religious and/or age discrimination – or any other protected classification – in its subsequent employment decisions pertaining to the posted senior administrator positions." (Jt. Appx. 1632.)

**Response:**    **Undisputed.**

311.    Defendant's March 2, 2020 Position Statement to the PHRC responding to Plaintiff's Complaint of discrimination and retaliation included that, "There is no evidence that decision-makers retaliated against Complainant based on her complaints of religious discrimination and/or age discrimination." (Jt. Appx. 1636.)

**Response:**    **Undisputed.**

Dated:  December 17, 2021          /s/ Michael E. Sacks
                                  NEIL J. HAMBURG
                                  MICHAEL E. SACKS
                                  ID. NO. 32175, 39774
                                  HAMBURG LAW GROUP, PLLC
                                  1 Franklin Town Blvd, Suite 1106
                                  Philadelphia, PA  19103
                                  (215) 432-1411

                                  Attorneys for Defendant

**CERTIFICATE OF SERVICE**

I certify that the foregoing Answer to Plaintiff's Statement of Additional Facts has been filed electronically and is available for viewing and downloading on the Court's CM/ECF system. I further certify that a copy of the Answer to Plaintiff's Statement of Additional Facts is being served electronically upon:

> Caren N. Gurmankin, Esquire
> Console Mattiacci Law, LLC
> 1525 Locust Street, 9th Floor
> Philadelphia, PA 19102
>
> gurmankin@consolelaw.com
>
> Attorneys for Plaintiff

Date: December 17, 2021                    /s/ Michael E. Sacks
                                           MICHAEL E. SACKS